Case No. _____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

═══════════════════════════════════════════════════

*In re*: Buzz Photos; Freedom Watch, Inc.; Larry Klayman; and Members of the
Class and Subclasses and Those Similarly Situated,
*Petitioners.*

---

On Petition for a Writ of Mandamus from the United States District Court for the
Northern District of Texas, Dallas Division
Case No. 3:20-cv-00656-K
*Respondent.*

---

## PETITION FOR WRIT OF MANDAMUS

---

Larry Klayman, Esq.
Freedom Watch, Inc.
7050 West Palmetto Park Rd.
Boca Raton, FL 33433
Washington, D.C. 20006
Tel: (310) 595-0800
Email: leklayman@gmail.com

*Counsel for Petitioners*

Date: May 22, 2024

## <u>TABLE OF CONTENTS</u>

Statement Regarding Oral Argument............................................................................ 1

Jurisdictional Statement............................................................................................... 1

Statement of Relief Sought .......................................................................................... 1

Introduction.................................................................................................................. 1

Issue Presented............................................................................................................. 2

Statement of Facts........................................................................................................ 2

Reasons the Writ Should Issue..................................................................................... 3

     I.  The District Court Clearly and Indisputably Erred......................................... 3

     II. Petitioners Have No Adequate Remedy By Appeal ...................................... 4

     III. Mandamus Is Appropriate Under the Circumstances.................................... 4

Conclusion ................................................................................................................... 5

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*In re Am. Airlines, Inc*., 972 F.2d 605 (5th Cir. 1992) .................................................. 3

*In re Chevron U.S.A., Inc*., 109 F.3d 1016 (5th Cir. 1997) ........................................... 3

*In re Gee*, 941 F.3d 153 (5th Cir. 2019) ....................................................................... 3

*In re JPMorgan Chase & Co*., 916 F.3d 494 (5th Cir. 2019) ........................................ 4

*In re Reyes*, 814 F.2d 168 (5th Cir. 1987) .................................................................... 3

*In re Volkswagen of Am., Inc*., 545 F.3d 304 (5th Cir. 2008) .................................. 3, 4

**Statutes**

18 U.S.C. § 2332(a), (b), (c) ........................................................................................ 1

18 U.S.C. § 2333 .......................................................................................................... 1

18 U.S.C. § 2339A ....................................................................................................... 1

28 U.S.C. § 1608(a)(4) ................................................................................................. 2

28 U.S.C. § 1608(d) ..................................................................................................... 2

28 U.S.C. § 1651 .......................................................................................................... 1

28 U.S.C. § 517 ............................................................................................................ 4

28 U.S.C. §1651(a) ................................................................................................... 1, 3

**Rules**

Federal Rules of Appellate Procedure 21(a)(1) – (3) .................................................. 1

## STATEMENT REGARDING ORAL ARGUMENT

Oral argument is neither necessary nor practicable here considering the narrow nature of the Petitioners' request for relief.

## JURISDICTIONAL STATEMENT

Jurisdiction of this Court is invoked under the All Writs Act, which provides in relevant part that "all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law." 28 U.S.C. §1651(a).

## STATEMENT OF RELIEF SOUGHT

Petitioners Buzz Photos, Freedom Watch, Inc., Larry Klayman, and Members of the Class and Subclasses and those similarly situated seek mandamus relief directing the district court to enter default against Defendant the Wuhan Institute of Virology (the "Institute").

## INTRODUCTION

Petitioners, Buzz Photos, Freedom Watch, Inc., Larry Klayman, and Members of the Class and Subclasses and those similarly situated, pursuant to 28 U.S.C. § 1651 and the Federal Rules of Appellate Procedure With Fifth Circuit Rules and Internal Operating Procedures 21(a)(1) – (3), hereby submit as follows:

On March 17, 2020, Plaintiffs filed suit against the People's Republic of China, the People's Liberation Army, the Wuhan Institute of Virology, Shi Zhengli and Major General Chen Wei for the creation and release of a variation of coronavirus known as COVID-19. The Complaint alleges violations of 18 U.S.C. § 2332(a), (b), (c), 18 U.S.C. § 2333, 18 U.S.C. § 2339A, negligence, wrongful death and assault and battery for intentionally ordering

subordinates not to disclose any information about this deadly disease to the public that was created as an effective and catastrophic biological warfare weapon to kill populations.

Since April 21, 2020, Plaintiffs have attempted to effectuate proper service pursuant to the Foreign Sovereign Immunities Act ("FSIA"). Each Defendant actively evaded service. *See* [Dkt. # 28 – Sworn Declaration Concerning Defendants' Refusal to be Duly Served]. Focusing only on Defendant the Institute, Petitioners sought the assistance of the U.S. Department of State, pursuant to 28 U.S.C. § 1608(a)(4), to properly effectuate service. The U.S. Department of State succeeded, and it served Defendant the Institute on January 5, 2024. The Institute defaulted on March 5, 2024, sixty (60) days after the U.S. Department of State served it with the Complaint.

## ISSUE PRESENTED

1.     Whether the district court clearly and indisputably erred when it failed to act to enter default against Defendant the Institute and ignored 28 U.S.C. § 1608(d) of the Foreign Sovereign Immunities Act ("FSIA").

## STATEMENT OF FACTS

In its Affidavit of Service, the U.S. Department of State confirmed that on January 5, 2024, "[t]he United States Embassy in Beijing China transmitted the documents to the Ministry of Foreign Affairs of the People's Republic of China under cover of diplomatic note no. 2023-1945 . . ." Then, on February 29, 2024, the U.S. Department of State confirmed that it successfully effectuated service of process on Defendant the Institute when it filed the Affidavit of Service to the Ministry of Foreign Affairs of the People's Republic of China ("Affidavit of Service"). [*See* Dkt. # 58] Pursuant to 28 U.S.C. § 1608(d), Defendant the Institute must have responded to the Complaint by March 5, 2024. Defendant the Institute is now in default.

**REASONS THE WRIT SHOULD ISSUE**

An appellate court has the power and must under 28 U.S.C. § 1651(a) to issue a writ of mandamus directing the conduct of a district court where certain criteria are satisfied. "When [a] writ of mandamus is sought from an appellate court to confine a trial court to a lawful exercise of its prescribed authority, the court should issue the writ almost as a matter of course." *In re Reyes*, 814 F.2d 168, 170 (5th Cir. 1987) (quoting *United States v. Denson*, 603 F.2d 1143, 1145 (5th Cir. 1979)). Parties seeking mandamus should satisfy a three-pronged test. First, petitioners "carry the burden of showing that their right to issuance of the writ is clear and indisputable." *In re Am. Airlines, Inc.*, 972 F.2d 605 (5th Cir. 1992). Second, petitioners should show that the district court's error is "not effectively reviewable on appeal." *In re Chevron U.S.A., Inc.*, 109 F.3d 1016, 1021 (5th Cir. 1997). Third, "the issuing court, in exercise of its discretion, must be satisfied that the writ is appropriate under the circumstances." *In re Volkswagen of Am., Inc.*, 545 F.3d 304, 311 (5th Cir. 2008).

Here, Petitioners are entitled to mandamus relief because it satisfies all prongs: (1) their right to the writ is clear and indisputable; (2) they have no other adequate means to obtain relief; and (3) the writ is appropriate under the circumstances. *In re Gee*, 941 F.3d 153, 157 (5th Cir. 2019); *In re Volkswagen*, 545 F.3d at 31.

I.    **THE DISTRICT COURT CLEARLY AND INDISPUTABLY IGNORED ITS DUTY TO ENTER A DEFAULT**

A right to mandamus is clear and indisputable when a district court clearly abuses its discretion and ignores its proscribed duty. *In re Volkswagen*, 545 F.3d at 311. The district court has clearly and indisputably violated its duty to enter a default in a significant way that warrants the remedy of mandamus.

3

Here, in a letter dates January 11, 2024 and filed with the lower court on February 5, 2024, the People's Republic of China had the U.S. Department of State file a Statement of Interest of the United States pursuant to 28 U.S.C. § 517 [Dkt. # 56] threatening the United States, its citizens, and the lower court. Indeed, the People's Republic of China threatens:

> China urges the U.S. side to fully recognize the great nature and harm of such frivolous lawsuits, attach great importance to and take seriously China's position and concerns, and immediately take every necessary measure to restrain and stop the frivolous lawsuits. It is required to influence and prompt the government of the State of Mississippi to withdraw the lawsuit at an early date, and urge the related courts to terminate the proceedings and dismiss the cases. If the U.S. side allows the frivolous lawsuits to proceed, the Chinese side reserves the right to take reciprocal countermeasures.

*See* [Dkt. # 56]. This appellate Court must intervene and direct the lower court to enter a default against Defendant the Institute, without regard to international politics and threats which thumbs its nose at American law and court process.  Fear of retaliation by the communist Chinese regime should play no part in this serious litigation.

## II.    PETITIONERS HAVE NO ADEQUATE REMEDY BY APPEAL

Petitioners easily satisfy the second prong – there is no other adequate remedy by appeal, since unless this case moves forward there is nothing to appeal. For this case to proceed, the lower court must enter default against Defendant the Institute.

## III.    MANDAMUS IS APPROPRIATE UNDER THE CIRCUMSTANCES

Finally, mandamus is an appropriate exercise of this Court's discretion and duty to follow the law. Mandamus is appropriate both where "the issues presented and decided above have an importance beyond" the case at hand, *In re Volkswagen*, 545 F.3d at 319, and "as a one-time device to 'settle new and important problems' that might have otherwise evaded expeditious review." *In re JPMorgan Chase & Co*., 916 F.3d 494, 499 (5th Cir. 2019). Both formulations justify mandamus here – to ensure that the entity responsible for creating the deadly COVID-19

disease is held accountable in a court of law. Federal Rule of Civil Procedure 12 clearly requires the lower court to enter a default, which request was made over two months ago on March 6, 2024, as Defendant the Institute it has refused to respond while showing disrespect for the U.S. legal system.

## CONCLUSION

For the foregoing reasons, this Court should grant mandamus relief and direct the district court to enter an entry of default against Defendant the Institute.

Respectfully submitted,

*/s/ Larry Klayman*
Larry Klayman, Esq.
Freedom Watch, Inc.
7050 West Palmetto Park Rd.
Boca Raton, FL 33433
Tel: (310) 595-0800
Email: leklayman@gmail.com

*Counsel for Petitioners*

May 22, 2024

**CERTIFICATE OF SERVICE**

I certify that the Petition for Writ of Mandamus was filed with the Court electronically on

May 24, 2024 and served on the individuals below via U.S. mail.

The Honorable Judge Ed Kinkeade
United States District Judge
Northern District of Texas
1100 Commerce Street #1625
Dallas, TX 75242

*/s/ Larry Klayman*

**CERTIFICATE OF COMPLIANCE**

This petition complies with: (1) the type-volume limitation of Federal Rule of Appellate Procedure 21(d) because it contains 1275 words, excluding the parts of the brief exempted by Rule 32(f); and (2) the typeface requirements of Rule 32(a)(5) and the type style requirements of Rule 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word.

*/s/ Larry Klayman*

# EXHIBIT A



**United States Department of State**

*Washington, D.C.  20520*

February 21, 2024

Ms. Karen Mitchell
United States District Court
Northern District of Texas
1100 Commerce St.
Dallas, TX 75242



3:20-cv-656

Re: *Buzz Photos, Inc. v. The People's Republic of China, et al.,* 1:20-cv-00168-LG-RHW

Dear Ms. Mitchell:

I am writing regarding the Court's request for transmittal of a Summons, Complaint, and Notice of Suit to the Wuhan Institute of Virology pursuant to 28 U.S.C. Section 1608(a)(4) as a defendant in the above referenced lawsuit.

The United States Embassy in Beijing, China transmitted the documents to the Ministry of Foreign Affairs of the People's Republic of China under cover of diplomatic note No. 2023-1945 dated and delivered on January 5, 2024. A certified copy of the diplomatic note is enclosed.[1]

Sincerely,

Jared N. Hess
Attorney Adviser
Office of the Legal Adviser
L/CA/POG/GC

---

[1] Please note that performance by the Department of State of its statutory functions under 28 U.S.C. § 1608 should not be construed as an indication in any way of the United States' position or views on whether plaintiffs have properly complied with all statutory requirements of the FSIA, the status or character of a defendant, whether service was properly effected, or the merits of any claims or defenses. *See* https://travel.state.gov/content/travel/en/legal/travel-legal-considerations/internl-judicial-asst/Service-of-Process/Foreign-Sovereign-Immunities-Act.html.

Cc:    Larry Klayman
       KLAYMAN LAW GROUP
       7050 W. Palmetto Park Rd., Suite 284
       Boca Raton, FL 33433



**United States Department of State**

*Washington, D.C.   20520*

I, Eric Terry, Vice Consul in Beijing, China certify that this is a true copy of the Embassy of the United States of America, diplomatic note number 2023-1945 dated 5 January 2024, and delivered to the Ministry of the Foreign Affairs of the People's Republic of China on 5 January 2024.

Eric Terry
Vice Consul

5 January 2024

UNCLASSIFIED

No. 2023-1945

The Embassy of the United States of America refers to the Ministry of Foreign Affairs of the People's Republic of China to the lawsuit *Buzz Photos, Inc. v. The People's Republic of China, et al., 1:20-cv-00168-LG-RHW*, which is pending in the U.S. District Court for the Northern District of Texas (Dallas). The Wuhan Institute of Virology is a defendant in this case. The Embassy transmits a Summons and Complaint herewith. The U.S. District Court for the Northern District of Texas (Dallas) has requested service of these documents. This note constitutes transmittal of these documents to the Government of the People's Republic of China as contemplated in Title 28, United States Code, Section 1608(a)(4).

Under applicable U.S. law a defendant in a lawsuit must file an answer to the Complaint or some other responsive pleading within 60 days of the date of transmittal of the Complaint, in this case the date of this note. Failing to do so, a defendant risks the possibility of having judgment entered against it without the opportunity to present arguments or evidence on its behalf. Therefore, the Embassy requests that the enclosed Summons and Complaint be forwarded to the

DIPLOMATIC NOTE

appropriate authority of the People's Republic of China with a view towards taking

whatever steps are necessary to avoid a default judgment.

In addition to the Summons and Complaint, the Embassy is enclosing a

Notice of Suit prepared by the plaintiff, which summarizes the nature of the case

and includes references to U.S. laws concerning suits against foreign States, and

certain other court documents that the plaintiff has requested be transmitted.

Under U.S. law any jurisdictional or other defense including claims of

sovereign immunity must be addressed to the court before which the matter is

pending, for which reason it is advisable to consult an attorney in the United

States.  It is the practice of the U.S. Department of State to be available to discuss

the requirements of U.S. law with counsel.  The U.S. Government is not a party to

this case and cannot represent other parties in this matter.

Attachments:

1. Summons, Complaint, Notice of Suit

2. Translations

Embassy of the United States of America

Beijing, January 5, 2024



*非正式译文 仅供参考*

第 2023-1945 号

　　美利坚合众国大使馆向中华人民共和国外交部提交诉讼案，Buzz
Photos, Inc.诉中华人民共和国，1:20-cv-00168-LG-RHW，此案正在美国德
克萨斯州北部地区法院(达拉斯)审理。 中华人民共和国湖北省武汉病毒研
究所是本案的被告。 大使馆随函转递传票和投诉书。 美国德克萨斯州北部
地区法院(达拉斯)已要求送达这些文件。 本说明根据《美国法典》第 28
篇第 1608（a）（4） 条的规定向武汉病毒研究所传送这些文件。

　　根据美国相关法律，诉讼中的被告必须在起诉书转交之日起 60 天内
（在本案中为本说明之日）提交对起诉书或其他回应性诉状的答复。 如在
本说明之日没有提交起诉书或者回应性诉状答复，被告将有可能在没有机会
提出代表自己的论点或证据的情况下而得到不利于被告的判决。 因此，大
使馆将所附传票和起诉书转交中华人民共和国有关当局，以便采取一切必要
措施避免缺席判决。

　　除传票和起诉书外，大使馆还附上原告准备的诉讼通知书，其中概述了
案件的性质，并提及了美国关于对外国提起诉讼的法律，以及原告要求转交
的其他法院文件。

　　根据美国法律，任何管辖权或其他辩护，包括主权豁免的主张，都必须向正在审理此事的法院提出，因此建议咨询美国的律师。 美国国务院的惯例是可与律师讨论美国法律的要求。 美国政府不是本案的当事方，也不能代表其他当事方处理此事。


附件： 1. 传票、起诉书、诉讼通知书

　　　　2. 翻译


　　　　　　　　　　　　　　　　　　美国驻华大使馆

　　　　　　　　　　　　　　　　2024 年 1 月 5 日于北京

AO 440 (Rev. 06/12) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
for the

Northern District of Texas (Dallas) ▾

| | |
|---|---|
| Buzz Photos, Inc., 2414 W University, Suite 115D, McKinney, Texas 75071 FREEDOM WATCH, Inc. 2020 Pennsylvania Avenue N.W. Suite 345 Washington, D.C. 20006 <br><br> *Plaintiff(s)* <br><br> v. <br><br> PEOPLE'S REPUBLIC OF CHINA; PEOPLE'S LIBERATION ARMY; WUHAN INSTITUTE OF VIROLOGY; SHI ZHENGLI; and MAJOR GENERAL CHEN WEI <br><br> *Defendant(s)* | ) ) ) ) ) ) ) ) ) ) ) ) <br><br> Civil Action No. 3:20-cv-00656-K-BN |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

THE WUHAN INSTITUTE OF VIROLOGY,
Xiao Hong Shan No. 44
Wuhan, P.R. China Postcode 430071

A lawsuit has been filed against you.

Within 60 days (not counting the day you received it) after service of this summons on you as a government, government agency, political subdivision, government official or government employee— the same as for the United States government as described in Fed. R. Civ. P. 12 (a)(2) or (3) — (but 21 days for a private, non-governmental defendant) — you must respond and serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure. You must file your answer or motion with the court.  The answer or motion must also be served on the plaintiffs' attorney, whose name and address are:

Larry Klayman, Esq., Freedom Watch, Inc., Plaintiffs' attorney
2020 Pennsylvania Avenue N.W. Suite 345
Washington, D.C. 20006
Telephone:   (561) 558-5336 E-mail: leklayman@gmail.com

If you fail to respond, judgment by default can be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court. It is due the next Monday if it falls on a Saturday or Sunday..

*CLERK OF COURT*

Date: _____06/09/2021_____     ___s/ N. Taylor___
*Signature of Clerk or Deputy Clerk*

案号：**3:20-cv-00656-K-BN**　文件 **46**　提交日期：**2021 年 6 月 9 日**　第 **3** 页，共 **10** 页　页号 **527**

AO 440（修订于 06/12）民事诉讼传票

# 美国联邦

地区法院

德克萨斯州北区（达拉斯）

| | |
|---|---|
| Buzz Photos, Inc., 2414 W University, Suite 115D, | ） |
| McKinney, Texas 75071 FREEDOM WATCH, Inc. | ） |
| 2020 Pennsylvania Avenue N.W. Suite 345 | ） |
| Washington, D.C. 20006 | ） |
| *原告* | ） |
| | ） |

民事诉讼编号：**3:20-cv-00656-K-BN**

*诉*

中华人民共和国；人民解放军；武汉病毒研究所；石正

丽；及陈薇少将

*被告*

### 民事诉讼传票

被送达人：（*被告名称和地址*）

武汉病毒研究所

中国武汉市小洪山中区 44 号

邮编：**430071**现有针对你方提起的诉讼。

在向你方（作为政府、政府部门、政治分支、政府官员或政府雇员）送达传票后 **60** 天（不包括送达当日）内（根据《联邦民事诉讼规则》第 12 (a)(2) 或 (3) 条规定，美国政府同样受此时限限制，但对于私人、非政府被告，此时限为 **21** 天），你方必须回应并向原告送达对所附诉状的回复或根据《联邦民事诉讼规则》第 12 条向原告送达动议。你方必须将回复或动议提交至法院。回复或动议还必须送达原告的律师，其名称和地址如下：

Larry Klayman 先生，原告律师
　　Freedom Watch, Inc.
　　2020 Pennsylvania Avenue N.W. , Suite 345
　　Washington, D.C. 20006
　　电话：(561) 558-5336
　　电子邮箱：leklayman@gmail.com

如你方未能回复，可作出缺席审判，由你方承担诉状中申请的救济。你方也必须将你方回复或动议提交至法院。如到期时间为周六或周日，则顺延至下周一。

*法院书记员*

［盖章：］美国联邦地区法院
德克萨斯州北区

日期：　2021 年 6 月 9 日　　　　　　　　　　　签名/ N. Taylor

*书记员或副书记员签名*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**

BUZZ PHOTOS
2414 W University, Suite 115D
McKinney, Texas 75071

      and

FREEDOM WATCH, Inc.
2020 Pennsylvania Avenue N.W. Suite 345
Washington, D.C. 20006

      and

LARRY KLAYMAN, a Natural Person

      and

Members of the Class and Subclasses and Those Similarly
Situated

                 Plaintiffs,

    v.

THE PEOPLE'S REPUBLIC OF CHINA

      and

THE PEOPLE'S LIBERATION ARMY,
The official military of China

      and

THE WUHAN INSTITUTE OF VIROLOGY,
and agency of the Government of China

      and

SHI ZHENGLI, Director of
the Wuhan Institute of Virology

and

Major General Chen Wei
of China's People's Liberation Army

                    Defendant.

**CLASS ACTION COMPLAINT** **CONCERNING MASSIVE DAMAGE CAUSED BY**

**DEFENDANTS AS A RESULT OF CLOVID-19  RELEASE FROM AN ILLEGAL AND**

**INTERNATIONALLY OUTLAWED BIOWEAPONS FACILITY IN THE CITY OF**

**WUHAN OF THE PEOPLE'S REPUBLIC OF CHINA**

In this class action complaint, lead Plaintiffs Buzz Photo, Freedom Watch, Inc., Larry

Klayman putative plaintiffs as members of the class and subclasses and  all persons and entities

similarly situated (collectively "Plaintiffs") sue Defendant the People's Republic of China and

the other Defendants as set forth herein, and show and allege as follows:

## I.    INTRODUCTION AND NATURE OF THE ACTION

1.  This is a complaint for damages and equitable relief arising out of the creation and

    release, accidental or otherwise, of a variation of coronavirus known as COVID-19 by the

    People's Republic of China and its agencies and officials as a biological weapon in

    violation of China's agreements under international treaties,[1]  and recklessly or otherwise

    allowing its release from the Wuhan Institute of Virology into the city of Wuhan, China,

    in Hubei Province, by among other acts  failing to prevent the Institute's personnel from

    becoming infected with the bioweapon and carrying it into the surrounding community

    and proliferation into the United States.

---

[1]      which in the nature of biological warfare can include discovering a life-threatening virus
or bacteria already existing in nature but then refining, developing, adapting, and/or perfecting it
as a weapon and illegally maintaining a stockpile of the bioweapon.

2. Since biological weapons have been outlawed since at least 1925, including by China's membership in treaties, these illegal weapons constitute and are in effect terrorist-related weapons of mass destruction of population centers.

3. This is a civil action on behalf of the lead Plaintiffs and other members of the class comprised of subclasses identified herein of those directly injured by the spread of COVID-19.

## II.    JURISDICTION AND VENUE

4. This Court has subject matter jurisdiction over this action pursuant to the Justice Against Sponsors of Terrorism Act ("JASTA") exception 18 **U.S.C.** § 2333.

5. The JASTA exception to the Foreign Sovereign Immunities Act (28 U.S.C. 1602, *et seq.*) incorporates the definition of international terrorism from 8 U.S.C. 2331.

6. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331.

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2), (3) and (4), as a civil action brought by citizens of the United States against subjects of a foreign state or foreign state, because there is complete diversity of citizenship between the Plaintiffs and the Defendants in China.

8. This Court also has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1605 (general exceptions to jurisdictional immunity of a foreign state).

9. The matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

10. This Court also has supplemental jurisdiction over this action pursuant to 28 U.S.C. § 1367.

11. Venue is proper in this district pursuant to 18 U.S.C. § 2334(a) and 28 U.S.C. §§ 1391(b)

and 1391(d).

12. **This class action complaint is being brought pursuant to Rule 23 (a) et. seq of the Federal Rules of Civil Procedure.**

### III.  PARTIES AND STANDING

13. Plaintiff Buzz Photos, which is located in and does and did substantial business in this judicial district, specializes in high school sports photography, serving students, parents, and schools in memorializing school events and promoting family and community involvement in school events.  The interruptions and closings of schools and cancellation of sports events caused by the illegal acts and practices alleged herein by each and every Defendant, jointly and severally, acting in concert as joint tortfeasors, has  shut down and closed Buzz Photos' business and its stands on the verge of bankruptcy.  The company lost about $50,000 over the last weekend alone.   The company has been forced by the COVID-19 epidemic to lay off employees.

14. Plaintiff Freedom Watch, Inc. is a 501(c)(3) non-profit corporation, which depends upon relatively small donations from many individuals.  Freedom Watch has a significant number of its donors who are individuals and entities in Texas and in this judicial district and thus it does substantial business in this district.  The ability to donate is greatly reduced by the economic recession and disruption and economic panic and growing catastrophe caused by the COVID-19 pandemic.

15. Plaintiff Larry Klayman is a citizen of Florida, who is admitted in the U.S. Disrict Court for the Northern District of Texas and he himself does substantial business in this district as a private practitioner.

16. Other putative plaintiffs are  members of the class and its subclasses.

17. The Defendant People's Republic of China ("PRC") is the recognized government of the nation country commonly known as "China."

18. The People's Liberation Army ("PLA") is the official military arm of the PRC.

19. The Wuhan Institute of Virology is a biological laboratory about 20 miles from the center of the city of Wuhan in China, which the Plaintiffs and members of the class and subclasses allege includes an illegal biological weapons laboratory.

20. Shi Zhengli is the Director of the Wuhan Institute of Virology in Wuhan, China.

21. Major General Chen Wei of China's PLA, at the PLA's Academy of Military Medical Sciences,  is the Chinese military's top epidemiologist and virologist, who is not only leading China's responses to the COVID-19 epidemic but also led the creation of the COVID-19 coronavirus as a bioweapon for China's military.

## IV.    CLASS ACTION STATUS

22. Plaintiffs and other members of the class and subclasses will  move the Court to certify this case and its causes of action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure ("FRCP"), including sub-classes.

23. FRCP Rule 23(a)(1) requires the lead Plaintiffs to show that "the class is so numerous that joinder of all members is impracticable."

24. FRCP Rule 23(c)(5) provides that "[w]hen appropriate, a class may be divided into subclasses that are each treated as a class under this rule."

25. Numerosity should be shown for each proposed class and subclass. *Marcus v. BMW of N. Am., LLC*, 687 F.3d 583, 595 (3rd Cir. 2012). Some courts find that numerosity is typically established when there are at least 40 class members. *Id.*

26. Rule 23(a)(3) requires the Plaintiffs to show that "the claims or defenses of the

representative parties are typical of the claims or defenses of the class." Plaintiff and the members of the class and subclasses can easily make this and other related showings under FRCP 23 for this suit to qualify as a class action.

27. Sub-class #1 for which the lead plaintiffs seek certification as a class consists of those who have been personally and physically infected by the COVID-19 virus as an illegal biological weapon, including have already died, or are now suffering damages of sickness, medical costs, disruption of regular activities and life, fear, emotional distress, and direct economic losses.

28. An estimated 3,000 U.S. citizens thus far have been infected with COVID-19 as of March 15, 2020, per the latest report by NBC News, and an estimated 61 have died as of March 15, 2020, according to CBS News, although the delay in widespread testing for the virus renders these numbers understated.

29. Accordingly, joinder of at least over 3,000 persons afflicted with the illness, a class which is rapidly expanding, is not practical.

30. The claims of the lead plaintiffs and of each member of the sub-classes are in substance the result of the same illegal acts and practices of each of the Defendants, acting in concert jointly and severally as joint tortfeasors, differing only in the extent of illness, the amount of medical bills, other expenses, lost income, and other consequences of the illness.

31. Sub-class #2 for which the lead plaintiffs seek certification as a class consists of those who have been injured financially by the severe disruption to the U.S. economy made necessary by efforts to contain and slow the spread of the pandemic.

32. Like named Plaintiffs Freedom Watch, Inc. which depends upon donations from

thousands of typically-small donors from the public from their available funds and
discretionary income, millions of employees, individuals working as IRS Form 1099
"contractors," small businesses, large businesses, travel companies and others are
suffering dramatic if not catastrophic economic losses from the attempts at isolation and
quarantine to contain the spread of the virus.

33. The number of unemployed, under-employed and disrupted small businesses is in the
hundreds of thousands and growing rapidly.

34. As just one notable example, Disney World in Orlando, Florida and Universal Orlando
have been closed, and many schools and universities.

https://www.dmagazine.com/frontburner/2020/03/a-running-list-of-dallas-cancellations-
and-changes-due-to-coronavirus/

35. Ohio and Illinois, among other states and localities, which are increasing minute by
minute, have ordered the closure of all bars and restaurants throughout those States, and
other States will quickly follow. Sports events and other public gatherings also also being
cancelled and the list is too long to set forth in this Complaint.

36. On Sunday, March 15, 2020, the Centers for Disease Control recommended cancellation
of all gatherings of 50 people or more for 8 weeks to slow the spread of the coronavirus
pandemic. Madeline Holcombe and Dakin Andone, "The CDC recommends organizers
cancel or postpone events with 50 people or more for 8 weeks," CNN, March 15, 2020,
accessible at https://www.cnn.com/2020/03/15/health/us-coronavirus-sunday-
updates/index.html

37. On Sunday, March 15, 2020, the Federal Reserve Bank dropped interest rates at which
banks may borrow from the Federal Reserve at the so-called "discount window" to 0%,

and launched a massive $700 billion of infusion of money into the financial system.

Steve Liesman, " Federal Reserve cuts rates to zero and launches massive $700 billion

quantitative easing program," CNBC.com, March 15, 2020, accessible at:

https://www.cnbc.com/2020/03/15/federal-reserve-cuts-rates-to-zero-and-launches-

massive-700-billion-quantitative-easing-program.html. For this and other reasons related

to the COVID-19 pandemic,  American stock markets are in a free fall and have already

lost about 30% of their value, which more severe losses expected to continue as part of a

stock market crash.

38. During the day on Monday, March 16, 2020, the Federal Reserve increased its total of

financial support for the financial industry by another $500 billion from $1.5 trillion.

39. Accordingly, joinder of those losing money in the near shut down of parts of our

economy, a class which is rapidly expanding, is not practical.

40. The claims of the lead Plaintiffs and of each member of the class and sub-classes are in

substance all the same, differing only in the amount of lost income, other expenses, lost

income, and other consequences of the medical and  economic disruption.

## V.    FACTS COMMON TO ALL COUNTS

41.      On or about November 15, 1984, China acceded to, ratified, and joined the

**"Convention on the Prohibition of the Development, Production and Stockpiling of**

**Bacteriological (Biological) and Toxin Weapons and on Their Destruction**" (hereinafter the

"Biological Weapons Convention").  See: http://disarmament.un.org/treaties/t/bwc/text

42.      As a member of the treaty, China has legally agreed under international law that

the manufacture, stockpiling, or deployment of  biological weapons are outlawed and illegal.

43.      China has agreed in that treaty that --

Determined, for the sake of all mankind, to exclude completely the possibility of bacteriological (biological) agents and toxins being used as weapons,

Convinced that such use would be repugnant to the conscience of mankind and that no effort should be spared to minimize this risk, Have agreed as follows:

**Article I**
Each State Party to this Convention undertakes never in any circumstances to develop, produce, stockpile or otherwise acquire or retain:
(1)    microbial or other biological agents, or toxins whatever their origin or method of production, of types and in quantities that have no justification for prophylactic, protective or other peaceful purposes;
(2)    weapons, equipment or means of delivery designed to use such agents or toxins for hostile purposes or in armed conflict.

**Article II**
Each State Party to this Convention undertakes to destroy, or to divert to peaceful purposes, as soon as possible but not later than nine months after the entry into force of the Convention, all agents, toxins, weapons, equipment and means of delivery specified in Article I of the Convention, which are in its possession or under its jurisdiction or control. In implementing the provisions of this Article all necessary safety precautions shall be observed to protect populations and the environment.

**Article III**
Each State Party to this Convention undertakes not to transfer to any recipient whatsoever, directly or indirectly, and not in any way to assist, encourage, or induce any State, group of States or international organisations to manufacture or otherwise acquire any of the agents, toxins, weapons, equipment or means of delivery specified in Article I of the Convention.

**Article IV**
Each State Party to this Convention shall, in accordance with its constitutional processes, take any necessary measures to prohibit and prevent the development, production, stockpiling, acquisition or retention of the agents, toxins, weapons, equipment and means of delivery specified in Article I of the Convention, within the territory of such State, under its jurisdiction or under its control anywhere.

**Article V**
The States Parties to this Convention undertake to consult one another

and to co-operate in solving any problems which may arise in relation to the objective of, or in the application of the provisions of, the Convention. Consultation and co-operation pursuant to this Article may also be undertaken through appropriate international procedures within the framework of the United Nations and in accordance with its Charter.

**Article VI**

(1)     Any State Party to this Convention which finds that any other State Party is acting in breach of obligations deriving from the provisions of the Convention may lodge a complaint with the Security Council of the United Nations. Such a complaint should include all possible evidence confirming its validity, as well as a request for its consideration by the Security Council.

(2)     Each State Party to this Convention undertakes to co-operate in carrying out any investigation which the Security Council may initiate, in accordance with the provisions of the Charter of the United Nations, on the basis of the complaint received by the Council. The Security Council shall inform the States Parties to the Convention of the results of the investigation.

**Article VII**

Each State Party to this Convention undertakes to provide or support assistance, in accordance with the United Nations Charter, to any Party to the Convention which so requests, if the Security Council decides that such Party has been exposed to danger as a result of violation of the Convention.

**Article VIII**

Nothing in this Convention shall be interpreted as in any way limiting or detracting from the obligations assumed by any State under the Protocol for the Prohibition of the Use in War of Asphyxiating, Poisonous or Other Gases, and of Bacteriological Methods of Warfare, signed at Geneva on 17 June 1925.

44. China is also a member of the "**Protocol for the Prohibition of the Use in War of Asphyxiating, Poisonous or Other Gases, and of Bacteriological Methods of Warfare**," signed at Geneva on 17 June 1925 ("Geneva Weapons Convention").

45.     Coronavirus is a grouping of viral diseases which are generally analogous to influenza, but even more harmful and deadly.

46.     Coronavirus variations have been known in years past.

47.     However, on November 17, 2019, a new military weapon variation of coronavirus

was noticed in Wuhan city, in central China's Hubei province, although reporting from

government records makes it unclear if it was recognized so early as a new disease. Josephine

Ma, " Coronavirus: China's first confirmed Covid-19 case traced back to November 17," South

China Morning Post, March 13, 2020, accessible at

https://www.scmp.com/news/china/society/article/3074991/coronavirus-chinas-first-confirmed-
covid-19-case-traced-back

48.     This new virus has been designated as COVID-19 or SARS-CoV-2.

49.     The first case confirmed to be COVID-19 infection is admitted to be on

December 8, 2019. *Id.*

50.     However, doctors in Wuhan and throughout China "were also ordered not to

disclose any information about the new disease to the public." *Id.*

51.     COVID-19 is an extremely dangerous disease, because it has an extremely

aggressive nature, was designed to mutate from person to person, spreads very quickly and

easily, no vaccine exists yet on account of it being a new disease, the means of transmission are

not fully known with certainty, and treatments are only just being worked out, and the disease

appears to be about ten times as deadly as the flu.

52.     COVID-19 was designed by China to be a very "effective" and catastrophic

biological warfare weapon to kill mass populations.

53.     Studies from scientists at Princeton University undergoing peer review show that

COVID-19 can survive in the air for up to three hours and be transmitted in the air and can

survive on inanimate surfaces for up to three days. See: John Bowden, "Tests Indicate

Coronavirus Can Survive in the Air," The Hill, March 11, 2020, accessible at:

https://thehill.com/policy/healthcare/487110-tests-indicate-coronavirus-can-survive-in-the-air

54.     This makes COVID-19 a very unusual and dangerous virus, seemingly hand-crafted to spread rapidly through multiple pathways.

55.     Meanwhile, there are many indications besides the nature of the disease demonstrating that the virus was engineered in the Chinese military's laboratory or laboratories

56.     In publicly and officially speaking about efforts in China to respond to COVID-19, Chinese leader Xi Jinping specifically linked efforts to prevent similar future threats to security of biological laboratories.   Xi explained these efforts by saying that laboratory safety is a "national security" issue.  See:  Steven Mosher, "Don't buy China's story: The coronavirus may have leaked from a lab," New York Post, February 22, 2020, accessible at:

https://nypost.com/2020/02/22/dont-buy-chinas-story-the-coronavirus-may-have-leaked-from-a-lab/

57.     The very next day, the Chinese Ministry of Science and Technology released a new directive titled: "Instructions on strengthening biosecurity management in microbiology labs that handle advanced viruses like the novel coronavirus."  *Id.*

58.     Thus, China's military and national leadership clearly linked the origins and spread of COVID-19 with safety protocols and containment at China's biomedical microbiology laboratories.

59.     The New York Post in a piece by Steven Mosher further reveals:

> "It sure sounds like China has a problem keeping dangerous pathogens in test tubes where they belong, doesn't it? And just how many "microbiology labs" are there in China that handle "advanced viruses like the novel coronavirus"?
>
> It turns out that in all of China, there is only one. And this one is located in the Chinese city of Wuhan that just happens to be … the epicenter of the epidemic.
>
> That's right. China's only Level 4 microbiology lab that is equipped to

12

handle deadly coronaviruses, called the National Biosafety Laboratory, is
part of the Wuhan Institute of Virology.

*Id.*

60.    Thus, although China's government -- which has power over all of China's society

and has always been opaque and non-forthcoming to other nations – has admittedly in official

statements linked the viral epidemic that broke out in Wuhan with the need to strengthen safety

protocols and security measures at the microbiology laboratory in Wuhan in Hubei Province.

61.    The Wuhan Institute of Virology is used for China's illegal biological warfare

weapons programs, according to experts:

> "Dany Shoham, a former Israeli military intelligence officer who has
> studied Chinese biological warfare, said the institute is linked to
> Beijing's covert bio-weapons program.
>                             * * *
> "China has denied having any offensive biological weapons, but a State
> Department report last year revealed suspicions of covert biological
> warfare work.
>                             * * *
> "Asked whether the new coronavirus may have leaked, Mr. Shoham said:
> "In principle, outward virus infiltration might take place either as
> leakage or as an indoor unnoticed infection of a person that normally
> went out of the concerned facility. This could have been the case with
> the Wuhan Institute of Virology, but so far there isn't evidence or
> indication for such incident.

Bill Gertz, The Washington Times, January 26, 2020, accessible at
https://www.washingtontimes.com/news/2020/jan/26/coronavirus-link-china-biowarfare-
program-possible/

> The former Israeli military intelligence doctor also said suspicions were
> raised about the Wuhan Institute of Virology when a group of Chinese
> virologists working in Canada improperly sent to China samples of what
> he described as some of the deadliest viruses on earth, including the
> Ebola virus.

> In a July article in the journal Institute for Defense Studies and Analyses,
> Mr. Shoham said the Wuhan institute was one of four Chinese
> laboratories engaged in some aspects of biological weapons
> development.

He said the secure Wuhan National Biosafety Laboratory at the institute
was engaged in research on the Ebola, Nipah and Crimean-Congo
hemorrhagic fever viruses.

The Wuhan virology institute is under the Chinese Academy of Sciences,
but certain laboratories within it "have linkage with the PLA or BW-
related elements within the Chinese defense establishment," he said.

\* \* \*

The Wuhan Institute of Biological Products is a civilian facility but is
linked to the Chinese defense establishment. Mr. Shoham said it is
thought to be involved in the Chinese Biological Weapons Convention
program. China's vaccine against SARS is probably produced there.

*Id.*

"Mr. Shoham holds a doctorate in medical microbiology. From 1970 to
1991 he was a senior analyst with Israeli military intelligence for
biological and chemical warfare in the Middle East and worldwide,
holding the rank of lieutenant colonel.

\* \* \*

Asked if the new coronavirus may have leaked, Mr. Shoham said: "In
principle, outward virus infiltration might take place either as leakage or
as an indoor unnoticed infection of a person that normally went out of
the concerned facility. This could have been the case with the Wuhan
Institute of Virology, but so far there isn't evidence or indication for
such incident."

Bill Gertz, The Washington Times, January 24, 2020, accessible at
https://www.washingtontimes.com/news/2020/jan/24/virus-hit-wuhan-has-two-laboratories-
linked-chines/

62.     Many reputable people and organizations and experts have thus come to the

conclusion that this crisis began when a Chinese biological weapons facility accidentally

released the COVID-19 virus into the atmosphere. An opinion column in The Hill states:

"The conventional, and mostly likely, view of the COVID-19 outbreak is
that it originated in Wuhan, China, near the most sophisticated Chinese
bioweapons lab and then proceeded into the world from there, leaving
people to guess whether it originated in the lab and leaked, came from
wild bats or snakes, or came from exotic meat market
.

Grady Means, "The coronavirus: Blueprint for bioterrorism," The Hill, March 9, 2020, accessible

at https://thehill.com/opinion/national-security/485921-the-coronavirus-blueprint-for-

bioterrorism

63.     It has been reported that:

> "The very first patient identified had *not* been exposed to the
> market, suggesting the virus may have originated elsewhere and
> been transported to the market, where it was able to thrive or jump
> from human to animal and back again."

Jackson Ryan, "Coronavirus and COVID-19: All your questions answered," Cnet.com, March
11, 2020, section "Where did the virus come from," accessible at https://www.cnet.com/how-
to/coronavirus-and-covid-19-all-your-questions-answered/#wherefrom *(emphasis in original)*.

*See, also,* Prof Chaolin Huang, MD, Yeming Wang, MD, Prof Xingwang Li, MD, Prof Lili Ren,
PhD, Prof Jianping Zhao, MD, Yi Hu, MD, et al., "Clinical features of patients infected with
2019 novel coronavirus in Wuhan, China," THE LANCET, Volume 395, Issue 10223, February
15, 2020, accessible at: https://www.thelancet.com/journals/lancet/article/PIIS0140-
6736(20)30183-5/fulltext#seccestitle170

64.     Those, including doctors and researchers, trying to spread the word in China

about the new COVID-19 disease were arrested or "disappeared."

65.     Dr. Li Wenliang of Wuhan finally violated Chinese censorship and raised the

alarm to the outside world internationally through a chat room of his classmates on December

30, 2019.

66.     Dr. Li was then summoned by authorities in China, reprimanded, and silenced.

67.     Speaking to the New York Times, he explained: "If the officials had disclosed

information about the epidemic earlier," Dr. Li told The Times."I think it would have been a lot

better. There should be more openness and transparency."

68.     On February 6, 2020, Dr. Li then, not coincidentally, died of the very disease he

was working to fight.

69.     Major General Chen Wei of China's PLA, of the PLA's Academy of Military

Medical Sciences,  played a leading role within China of fighting the SARS outbreak in 2003-

2003, and to fight Ebola including developing a vaccine for Ebola in 2014.

70.     Nevertheless, these efforts to minimize the damage caused for fighting disease

within the Chinese military also provided Chen with expertise in recognizing, devising, and

stockpiling for China's military the most effective bioweapons.

71.     Indeed, curiously, in the attempt to put the COVID-19 disease "back in the bottle"

Major Gen. Chen injected herself and six members of her staff with a potential vaccine which

had not yet been tested on animals.  David Gilbert, "A Chinese Doctor Injected Herself with an

Untested Coronavirus," Vice, March 4, 2020, accessible at:

https://www.vice.com/en_us/article/v74p5y/a-chinese-doctor-injected-herself-with-an-untested-

coronavirus-vaccine

72.     Thus, through the use of a possible vaccine on herself, Major Gen. Chen's actions

are consistent with  desperation and  her and her nation's guilt that the Chinese military and all of

the Defendants, acting in concert, jointly and severally as joint tortfeasors, caused this

burgeoning national and world catastrophe.

## VI.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
*AIDING AND ABETTING THE RISK OF DEATH OR*
*SERIOUS BODILY INJURIES TO UNITED STATES CITIZENS  AND MEMBERS OF*
*THE CLASS AND SUBCLASSES IN VIOLATION*
*OF 18 U.S.C. § 2332(a); 18 U.S.C. § 2332(b); 18 U.S.C. § 2332(c) AND 18 U.S.C. § 2333*

73. Plaintiffs and the other members of the class and subclasses repeat and re-allege each and

every allegation of the foregoing paragraphs as if fully set forth herein.

74. By the acts alleged herein, Defendants, each and every one of them, jointly and severally

as joint tortfeasors, are committing and/or aiding and abetting and conspiring to help the

commission of acts of international terrorism.

75. Each of the Defendants provides substantial assistance to acts of terrorism in violation of 18 U.S.C. § 2332 and 18 U.S.C. § 2332a.

76. Each of the Defendants knows, or has recklessly disregarded, that it is providing material support to what is in effect constitutes international terrorism.

77. By aiding and abetting violations of 18 U.S.C. § 2332 that have caused harm as pled herein and at a minimum placed each of the Plaintiffs in imminent danger in his or her person, property, and/or business.

78. Defendants are jointly and severally liable as joint tortfeasors pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiff(s) have sustained as a result of such injuries.

## SECOND CAUSE OF ACTION
### *PROVISION OF MATERIAL SUPPORT TO TERRORISTS IN VIOLATION OF 18 U.S.C. § 2339A AND 18 U.S.C. § 2333*

79. Plaintiffs and each of the members of the class and subclasses repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

80. Each of the Defendants, each and every one of them acting in concert as joint tortfeasors is providing material support to the preparation and carrying out of numerous acts of what in effect constitutes international terrorism which have placed the Plaintiff(s) in imminent danger of death or illness.

81. By participating in the commission of violations of 18 U.S.C. § 2339A that have caused each of the Plaintiffs to be injured in his or her person, business or property, Defendants are jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiffs and the class and subclasses have sustained as a result of the actions pled herein.

82. As a result of such support to terrorist groups, Defendants violated the law of nations, established U.S. law, international laws, treaties and norms, including but not limited to those sections previously set forth: The Declaration on Measures to Eliminate International Terrorism and citations therein incorporated by reference adopted by the United Nations General Assembly on December 9, 1994 (GA Res. 49/50); The Anti-Terror Act, 18 U.S.C. 113B; The Anti-Terrorism and Effective Death Penalty Act, Pub. L. No. 104-132, 110 Stat. 1214 (1996); The Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 ("USA Patriot Act"), Pub. L. No. 107-56, 115 Stat. 271 (2001); The Convention on the Prevention and Punishment of the Crime of Genocide; Art. 2, December 9, 1949, 78 UNTS; International Convention for the Suppression of the Financing of Terrorism, 39 I.L.M. 270 (Dec. 9, 1997); G.A. Res. 54/109, 1 UN Doc A/RES/54/109 (Dec. 1, 1999) and ratified by over 130 countries (The Financing Convention); United Nations Charter, 59 State. 1031, 3 Bevans 1153 (1945); Universal Declaration of Human Rights, G.A. Res. 217A (iii), U.N. Doc. A/810 (1948); International Covenant on Civil and Political Rights, G.A. Res. 2222A(xxi), 21 U.N. Doc., GAOR Supp. (No. 16) at 52 U.N. Doc. A 6316 (1966); Common Article 3 of the 1949 Geneva Convention; Article 4 and 13 of the 1997 Geneva Protocol II; Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, 37 I.L.M. 1(Dec. 18, 1997); and other fundamental principles.

### THIRD CAUSE OF ACTION
*CONSPIRACY TO CAUSE INJURY AND EVEN DEATH OF U.S. CITIZENS AND MEMBERS OF THE CLASS AND SUBCLASSES IN VIOLATION OF 18 U.S.C. §§ 2332(b) and 2333*

83. Plaintiffs and each of the members of the class and subclasses repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

84. Although it appears that the COVID-19 virus was released at an unplanned, unexpected time, it was prepared and stockpiled as a biological weapon to be used against China's perceived enemies, including but not limited to the people of the United States.

85. While COVID-19 virus may be too slow acting and slow-spreading to be used quickly against an enemy's military, it was designed to be used agaist the general population of one or more of China's perceived enemy nations, such as the United States.

86. Thus, the Defendants, each and every one of them acting in concert jointly and severally as joint tortfeasors, created and/or refined and then stockpiled biological weapons for the express purpose of using such weapons against its perceived enemies, including but not limited to the people of the United States.

87. The Defendants, each and every one of them acting in concert jointly and severally as joint tortfeasors, acted and/or conspired to harm U.S. citizens using these biological weapons.

88. Because China has agreed by treaty to outlaw such weapons, these actions cannot be official governmental actions of the People's Republic of China and are not subject to any possible claim of legal immunity from suit.

89. Although the actual release of the COVID-19 bioweapon appears to have been unintentional and not intended to be released in the laboratory's backyard, the purpose

of maintaining the virus within the laboratory was to use it to kill U.S. citizens and
other persons and entities in nations perceived to be an enemy of China.

90. The Defendants thus attempted to and did harm U.S. citizens in violation of 18
U.S.C. § 1113.

91. Each of the Plaintiffs and members of the class and subclasses have, at a minimum,
also been placed in imminent danger in his person, property or business as prohibited
by 18 U.S.C. § 2332 and 18 U.S.C. § 2332a.

92. The acts of terrorism at issue are extreme and outrageous and committed to cause
extreme physical pain and suffering, and financial loss to Plaintiffs and members of
the class and subclasses.

93. Defendants agreed, including by implication or common understanding, to combine with
each other, their agents, and other persons to act unlawfully, in the manner set forth in
this Complaint and committed overt acts in furtherance of the conspiracy.

94. At all relevant times, Defendants, each and every one of them acting in concert as joint
tortfeasors, jointly and severally, knew of this conspiracy and knew and knows, in
particular, of the roles of charitable front organizations and their leaders in furtherance of
that conspiracy

95. At a minimum, Defendants recklessly disregarded the nature and purposes of the
conspiracy.

96. Defendants knowingly and purposefully agreed to perform the acts complained of herein
with the knowledge, and for the purpose, that such services facilitate their mutual goals
and support what are in effect and thus constitute terrorist activities pursuant to a
common scheme to encourage and incentivize acts of terrorism.

97. By conspiring to support, encourage and facilitate violations of 18 U.S.C. § 2332 that have injured each plaintiff's respective person, property, or business, Defendants, each and every one of them,  jointly and severally as joint tortfeasors, are liable pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiffs and members of the class and subclasses have sustained as a result of such injuries.

98. By encouraging and facilitating violations of and 18 U.S.C. § 2332a that have injured each of the lead Plaintiffs the class and subclasses in their person, property, employment or businesses, and Defendants, each and every one of them, are jointly and severally liable pursuant to 18 U.S.C. § 2333 for any and all damages that Plaintiffs and the members of the class and subclasses have sustained as a result of such illegal acts.

### FOURTH  CAUSE OF ACTION
### NEGLIGENCE

99. Plaintiffs and each of the members of the class and subclasses repeat and re-allege each and every allegation of the foregoing paragraphs as if fully set forth herein.

100.    Each of the Defendants, each and every one  of them acting in concert jointly and severally as joint tortfeasors, owe a duty under the conventions and thus Plaintiffs and members of the class and subclasses outlawing biological weapons to assertively destroy biological weapons as well as to refrain from creating or stockpiling them and to report to the other treaty members all known facts to avoid the spread or release of biological weapons.

101.    The inherent act of creating, refining, and/or maintaining supplies of COVID-19 was illegal and banned under the terms of the treaties China has acceded to.

102.    Each of the Defendants each and every one of them jointly and severally as joint tortfeasors owed a duty of ordinary care to handle outlawed and illegal biological

weapons which are inherently extremely dangerous materials with the care needed to avoid the foreseeable, natural, inevitable deadly consequences of those inherently dangerous materials nearly certain to foreseeably cause loss of human life and severe injuries at a minimum.

103.   In violation of the Defendant's duty of care, the Defendants recklessly, wantonly, willfully created an unreasonable risk of death and dangerous illness toward Plaintiffs and other members of the class and subclasses by failing to maintain banned and unlawful bioweapons with adequate protections and safeguards against their accidental release.

104.   In violation of each of the Defendant's duty of care, acting in concert jointly and severally as joint tortfeasors, each of the Defendants allowed the COVID-19 virus to escape from a laboratory in or near Wuhan, China, which is the Wuhan Institute of Virology, or a sub-component thereof.

105.   As a direct and proximate consequence of Defendants', each and every one of them acting in concert jointly and severally as joint tortfeasors, wanton and irresponsible recklessness and negligence, the public release and spread of COVID-19 has caused the Plaintiffs and other members of the class and subclasses illness, death, medical expenses, economic disruption and damage, loss of employment and other great losses including but not limited to loss of time for their chosen lives, and social disruption.

### FIFTH CAUSE OF ACTION
### WRONGFUL DEATH

106.    Plaintiffs and members of the class and subclasses repeat and re-allege each and

every allegation of the foregoing paragraphs as if fully set forth herein.

107.    The Defendants, each and every one of them, jointly and severally as joint

tortfeasors, are responsible for the deaths of at least 41 U.S. citizens, and mounting,

and others in the class from COVID-19 viral infections.

108.    By reason of the wrongful conduct of Defendants, Plaintiffs, on behalf of

themselves and their family and Plaintiffs' and members of the class and subclasses,

and their decedents, suffered conscious pain, suffering, severe emotional distress and

death, and have suffered pecuniary and economic damage, loss of support, loss of

nurture, care and guidance, grief, anguish, loss of services, loss of society, and other

mental and physical injuries and even death.

## SIXTH CAUSE OF ACTION
## ASSAULT AND BATTERY

109.    Plaintiffs and members of the class and subclasses repeat and re-allege each and

every allegation of the foregoing paragraphs as if fully set forth herein.

110.    The Defendants, each and every one of them, jointly and severally as joint

tortfeasors, have caused physical damage and harm to the members of the class and

subclasses, particulary in subclass #1 and subclass #2, by physically infected the

bodies of the class members.

111.    The Defendants, each and every one of them, jointly and severally, have also

placed all members of sub-class #1 and sub-class #2 in reasonable fear of imminent

harm and/or death.

112.    By reason of the wrongful conduct of Defendants, Plaintiffs and members of the

class and subclasses suffered conscious pain, suffering, severe emotional distress and

the fear of imminent serious bodily injury or death, and death, and have suffered

pecuniary and economic damage, loss of support, loss of nurture, care and guidance,

grief, anguish, loss of services, loss of society, and other mental and physical injuries.

## **PRAYER FOR RELIEF**

Plaintiffs demand that judgment, after a jury trial, be entered against Defendants each and

every one of them, jointly and severally as joint tortfeasors, for compensatory and actual

damages because of their demonstrable physical and emotional injury to Plaintiffs and the class

and subclases, punitive damages because of Defendants callous and reckless indifference and

malicious acts, and attorneys fees, costs, an award in excess of $20 trillion U.S. Dollars and such

other relief the Court may deem just and proper.

## **JURY DEMAND**

Plaintiffs respectfully demand a jury trial on all issues so triable.

Dated:   March 17, 2020

Respectfully submitted,
*/s/ Larry Klayman*
Larry Klayman, Esq.
A Member of this Court's Bar
Freedom Watch, Inc.
2020 Pennsylvania Avenue N.W.
Suite 345
Washington, D.C. 20006
(561) 558-5336
leklayman@gmail.com

Attorney for Plaintiffs on behalf of himself
and Other Members of the Class and
Subclasses

美国联邦地区法院
德克萨斯州北区

BUZZ PHOTOS
2414 W University, Suite 115D
McKinney, Texas 75071

及

FREEDOM WATCH, Inc.
2020 Pennsylvania Avenue N.W. Suite 345
Washington, D.C. 20006

及

LARRY KLAYMAN，自然人

及

集体和子集体的成员以及类似处境的人士

原告，

诉

**中华人民共和国**

及

**中国人民解放军，**
中国国家武装力量

及

**武汉病毒研究所，**
一家中国政府机构

及

**石正丽，**
武汉病毒研究所主任

Case: 24-10454　　Document: 4-1　　Page: 46　　Date Filed: 05/23/2024
Case 3:20-cv-00656-K-BK　Document 58　Filed 02/27/24　Page 35 of 55　PageID 647

案号：3:20-cv-00656-K　文件 1　提交日期：2020 年 3 月 17 日　第 2 页，共 19 页　页号2

及

陈薇，中国人民解放军少将

被告。

**关于被告因源自中华人民共和国武汉市一座违反国际法的生物武器设施 COVID-19 释放而造成**

**巨大损害的<u>集体诉讼诉状</u>**

在本集体诉讼诉状中，主要原告 Buzz Photo、Freedom Watch, Inc.、Larry Klayman 和推定原告（作为集体和子集体的成员）以及所有类似处境的人士和实体（统称为"原告"）对被告中华人民共和国和本诉状所列示的其他被告提起诉讼，指控如下：

**I.** **<u>本诉讼简介及其性质</u>**

1. 中华人民共和国及其机构和官员违反中国在其签署的国际条约下的承诺，制造并（意外地或以其他方式）释放了一种名为 COVID-19 的冠状病毒变体生物武器[1]，并不顾后果地允许将其从武汉病毒研究所泄漏到中国湖北省武汉市，且除其他行为外，未能防止该研究所人员被该生物武器感染，并将其带入周围社区并扩散到美国，本诉状旨在寻求由此引起的损害赔偿和衡平救济。

2. 由于至少自 1925 年以来生物武器即被宣布为非法（中国加入了相关条约），这些非法武器构成并实际上是与恐怖分子相关的人口中心大规模杀伤武器。

3. 本诉讼是代表主要原告和集体其他成员提起的民事诉讼，该集体包括在本诉状中列明的因 COVID-19 传播而直接受到伤害的人士的子集体。

---

[1]　根据生物战的性质，可以包括发现已经存在于自然界中的威胁生命的病毒或细菌，但随后将其提纯、开发、改造和/或完善为武器，并非法维持生物武器的库存。

案号：**3:20-cv-00656-K**　文件 **1**　提交日期：**2020 年 3 月 17 日**　第 **3** 页，共 **19** 页　页号**3**

**II.**　　司法管辖权和审判地

　4.　根据《对恐怖主义资助者实行法律制裁法案》（以下简称"JASTA"）例外条款（**美国法典**第 18 编第 2333 条）的规定，本法院对此诉讼具有属事管辖权。

　5.　《外国主权豁免法案》（美国法典第 28 编第 1602 条及以下各条）的 JASTA 例外条款纳入了《美国法典》第 8 编第 2331 条中对国际恐怖主义的定义。

　6.　根据《美国法典》第 28 编第 1331 条，本法院对此诉讼具有属事管辖权。

　7.　根据《美国法典》第 28 编第 1332(a)(2)、(3) 和 (4) 条，本法院对此诉讼具有属事管辖权，此诉讼是由美国公民对外国或外国公民提起的民事诉讼，因为原告和中国的被告有完全不同的国籍。

　8.　根据《美国法典》第 28 编第 1605 条（外国管辖豁免的一般例外），本法院对此诉讼也有属事管辖权。

　9.　争议事项的总额或价值超过了 75,000 美元，不包括利息和费用。

　10.　根据《美国法典》第 28 编第 1367 条，本法院对此诉讼也有补充管辖权。

　11.　根据《美国法典》第 18 编第 2334(a) 条和第 28 编第 1391(b) 条和第 1391(d) 条，本地区作为审判地点是合适的。

　12.　**本集体诉讼诉状根据《联邦民事诉讼规则》第 23 (a) 条等提起。**

**III.**　　诉讼当事人和状况

　13.　原告 Buzz Photos 位于本司法区，目前及以往均主要在本司法区开展业务，专门从事高中体育摄影，为学生、家长和学校纪念活动以及促进家庭和社区参与学校活动提供服务。由于本诉状中指控的每一位被告（作为一致行动共同侵权人共同和分别）的非法行为和做法造成学校停学及关闭以及体育赛事取消，Buzz Photos 已经停止运营，且濒临破产。仅在上个周末，该公司就损失了约 50,000 美元。COVID-19 疫情迫使公司裁员。

3

案号：3:20-cv-00656-K    文件 1    提交日期：2020 年 3 月 17 日    第 4 页，共 19 页    页号4

14. 原告 Freedom Watch, Inc. 是一家 501(c)(3) 非营利公司，依靠多人相对较小金额的捐赠维持运营。Freedom Watch 在德克萨斯州和本司法区拥有大量的个人和实体捐赠者，因此在本司法区存在大量业务。由于 COVID-19 暴发导致的经济衰退和混乱、经济恐慌和日益严重的灾难，人们的捐赠能力大大降低。

15. 原告 Larry Klayman 是佛罗里达州公民，他的诉讼在美国德克萨斯州北区的迪斯累克法院受理，他本人作为一名私人执业者在该地区存在大量业务。

16. 其他推定原告是该集体及其子集体的成员。

17. 被告中华人民共和国是公认的民族国家政府，通常称为"中国"。

18. 中国人民解放军是中华人民共和国的官方军事部门。

19. 武汉病毒研究所是一座生物实验室，距离中国武汉市中心约 20 英里，原告和该集体及子集体成员诉称武汉病毒研究所设有非法的生物武器实验室。

20. 石正丽是中国武汉市武汉病毒研究所主任。

21. 中国人民解放军军事医学科学院少将陈薇是中国军方的顶级流行病学家和病毒学家，她不仅是中国应对 COVID-19 疫情的领导者，还领导制造了作为中国军方生物武器的 COVID-19 冠状病毒。

IV.    **集体诉讼地位**

22. 原告和该集体及子集体的其他成员将请求法院根据《联邦民事诉讼规则》(FRCP) 第 23 条的规定证明此案及其诉因属于集体诉讼，包括子集体。

23. FRCP 规则第 23(a)(1) 条要求主要原告证明"集体成员人数众多，所有成员共同诉讼是不可行的。"

24. FRCP 规则第 23(c)(5) 规定，"在适当的情况下，一个集体可分为根据该规则分别被视为一个集体的若干子集体。"

4

案号：3:20-cv-00656-K  文件 1  提交日期：2020 年 3 月 17 日  第 5 页，共 19 页  页号5

25. 应当证明每个集体和子集体人数众多。*Marcus 诉 BMW of N. Am., LLC*，687 F.3d 583, 595

（第 3 巡回法院，2012 年）。一些法院认定，至少有 40 名集体成员时通常可证明人数众

多。*同上*。

26. 规则第 23(a)(3) 条要求原告证明"当事人代表的索赔或抗辩是该集体的典型索赔或抗辩。"

原告和该集体及子集体的成员根据 FRCP 第 23 条可以很容易地作出这一证明和其他相关

证明，证明本诉讼有资格成为集体诉讼。

27. 主要原告寻求证明的子集体 1，作为一个集体，包括已经被非法生物武器 COVID-19 病毒

实际感染的人，包括已经死亡的人，或正在遭受疾病、医疗费用、正常活动和生活中断、

恐惧、精神痛苦和直接经济损失的损害的人。

28. 根据美国国家广播公司新闻的最新报道，截至 2020 年 3 月 15 日，估计有 3,000 名美国公

民感染了 COVID-19，据哥伦比亚广播公司新闻报道，截至 2020 年 3 月 15 日，估计有 61

人死亡，尽管对该病毒的广泛检测的延迟已使得这些数字被低估了。

29. 因此，至少 3,000 多名患病者（这一集体正在迅速扩大）共同诉讼是不切实际的。

30. 主要原告和每个子集体成员的索赔实质上是每一位被告（作为一致行动共同侵权人共同

和分别）的相同非法行为和做法的结果，只是在疾病程度、医疗费用、其他费用、收入

损失和疾病的其他后果方面有所不同。

31. 主要原告寻求证明的子集体 2 包括因努力控制和减缓疫情蔓延对美国经济造成严重破坏

而遭受经济损失的人。

32. 例如列明的原告 Freedom Watch, Inc.，该公司依赖于成千上万名的小捐赠人的捐赠，这些

捐赠来自公众的可用资金和可支配收入，数百万雇员、以美国国税局 1099 表格"承包商"

身份工作的个人、小企业、大企业、旅游公司和其他人正在因试图通过隔离来遏制病毒

传播而遭受着巨大的（如果不是灾难性的）经济损失。

33. 失业、就业不足和业务中断的小企业数量成千上万，并且在迅速增长。

5

34. 一个突出的例子，奥兰多、佛罗里达和奥兰多环球的迪斯尼世界已经关闭，许多学校和大学也已停课。

    https://www.dmagazine.com/frontburner/2020/03/a-running-list-of-dallas-cancellations-and-changes-due-to-coronavirus/

35. 俄亥俄州和伊利诺伊州，以及其他州和地区（每分钟都在增加），已经下令关闭这些州的所有酒吧和餐厅，其他州也将很快跟进。体育赛事和其他公共集会也将被取消，名单太长，无法在本诉状中列出。

36. 2020 年 3 月 15 日周日，疾病控制中心建议取消所有 50 人或以上的集会，为期 8 周，以减缓冠状病毒的蔓延。Madeline Holcombe 和 Dakin Andone，"疾病控制中心建议组织者取消或推迟有 50 人或以上的活动，为期 8 周。"CNN，2020 年 3 月 15 日，可在以下网址查看：https://www.cnn.com/2020/03/15/health/us-coronavirus-sunday- updates/index.html

37. 2020 年 3 月 15 日周日，美联储将银行在所谓的"贴现窗口"从美联储借款的利率降至 0%，并向金融体系注入了 7,000 亿美元的巨额资金。

    Steve Liesman，"美联储将利率降至零，并启动 7,000 亿美元的量化宽松计划"，CNBC.com，2020 年 3 月 15 日，可在以下网址查看：https://www.cnbc.com/2020/03/15/federal-reserve-cuts-rates-to-zero-and-launches-massive-700-billion-quantitative-easing-program.html。由于这一原因以及与 COVID-19 疫情相关的其他原因，美国股市正处于自由落体状态，已经损失了约 30% 的市值，预计随着股市崩盘，更严重的损失预计还将继续。

38. 2020 年 3 月 16 日周一，美联储将对金融业的财政支持总额在 1.5 万亿美元基础上又增加了 5,000 亿美元。

39. 因此，在我们的部分经济即将倒闭的时候，遭受损失的人是一个快速扩张的集体，进行共同诉讼是不切实际的。

40. 主要原告以及该集体和子集体的每个成员的索赔实质上都是一样的，只是在收入损失、

其他费用的金额以及医疗和经济中断的其他后果方面有所不同。

**V.     所有罪状的共同事实**

41. 1984 年 11 月 15 日左右，中国同意、签署并加入了**《禁止细菌（生物）及毒素武器**

**的发展、生产和储存以及销毁这类武器的公约》**（以下简称《生物武器公约》）。可在以下网址查看：

http://disarmament.un.org/treaties/t/bwc/text

42. 作为该条约的成员，中国在国际法下承认，制造、储存或部署生物武器是非法的。

43. 中国在该条约中承认—

决心为了全人类，彻底排除使用细菌（生物）剂和毒素作为武器的可能性，

深信这种使用为人类良心所不容，并应竭尽全力使这种危险减到最低限度，议定条款如下：

**第一条**
本公约各缔约国承诺在任何情况下决不发展、生产、储存或以其他方法取得或保有：
（1）凡类型和数量不属于预防、保护或其他和平用途所正当需要的微生物剂或其他生物剂或毒素，不论其来源或生产方法如何；
（2）凡为了将这类物剂或毒素使用于敌对目的或武装冲突而设计的武器、设备或运载工具。

**第二条**
本公约各缔约国承诺尽快但至迟应于本公约生效后 9 个月内，将其所拥有的或在其管辖或控制下的凡属本公约第一条所规定的一切物剂、毒素、武器、设备和运载工具销毁或转用于和平目的。在实施本条规定时，应遵守一切必要的安全预防措施以保护居民和环境。

**第三条**
本公约各缔约国承诺不将本公约第一条所规定的任何物剂、毒素、武器、设备或运载工具直接或间接转让给任何接受者，并不以任何方式协助、鼓励或引导任何国家、国家集团或国际组织制造或以其他方法取得上述任何物剂、毒素、武器、设备或运载工具。

**第四条**
本公约各缔约国应按照其宪法程序采取任何必要措施，以便在该国领土境内，

7

在属其管辖或受其控制的任何地方，禁止并防止发展、生产、储存、取得或保有本公约第一条所规定的物剂、毒素、武器、设备和运载工具。

**第五条**

本公约各缔约国承诺，在解决有关本公约的目标所引起的或在本公约各项条款的应用中所产生的任何问题时，彼此协商和合作。

本条所规定的协商和合作也可在联合国范围内根据联合国宪章通过适当国际程序进行。

**第六条**

(1)    本公约任何缔约国如发现任何其他缔约国的行为违反由本公约各项条款所产生的义务时，得向联合国安全理事会提出控诉。这种控诉应包括能证实控诉成立的一切可能证据和请安全理事会予以审议的要求。

(2)    本公约各缔约国承诺，在安全理事会按照联合国宪章条款根据其所收到的控诉而发起进行的任何调查中，给予合作。安全理事会应将调查结果通知本公约各缔约国。

**第七条**

本公约各缔约国承诺，如果安全理事会断定由于本公约遭受违反而使本公约任何缔约国面临危险，即按照联合国宪章向请求援助的该缔约国提供援助或支持这种援助。

**第八条**

本公约中的任何规定均不得解释为在任何意义上限制或减损任何国家根据 1925 年 6 月 17 日在日内瓦签订的《禁止在战争中使用窒息性、毒性或其他气体和细菌作战方法的议定书》所承担的义务。

44.    中国也是 1925 年 6 月 17 日在日内瓦签订的**《禁止在战争中使用窒息性、毒性或其他气体和细菌作战方法的议定书》**（《日内瓦武器公约》）的成员。

45.    冠状病毒是一种病毒性疾病类别，通常类似于流感，但危害更大，致命性更强。

46.    冠状病毒变体在过去几年中已经广为人知。

47.    但是，2019 年 11 月 17 日，在中国中部的湖北省武汉市发现了一种新的军用武器冠状病毒变体，尽管政府记录的报告表明，尚不清楚是否早在那时已经确认为一种新疾病。Josephine Ma，"冠状病毒：中国首例 Covid-19 确诊病例可追溯至 11 月 17 日，《南华早报》，2020 年 3 月 13

在属其管辖或受其控制的任何地方，禁止并防止发展、生产、储存、取得或保有本公约第一条所规定的物剂、毒素、武器、设备和运载工具。

**第五条**

本公约各缔约国承诺，在解决有关本公约的目标所引起的或在本公约各项条款的应用中所产生的任何问题时，彼此协商和合作。

本条所规定的协商和合作也可在联合国范围内根据联合国宪章通过适当国际程序进行。

**第六条**

(1)    本公约任何缔约国如发现任何其他缔约国的行为违反由本公约各项条款所产生的义务时，得向联合国安全理事会提出控诉。这种控诉应包括能证实控诉成立的一切可能证据和提请安全理事会予以审议的要求。

(2)    本公约各缔约国承诺，在安全理事会按照联合国宪章条款根据其所收到的控诉而发起进行的任何调查中，给予合作。安全理事会应将调查结果通知本公约各缔约国。

**第七条**

本公约各缔约国承诺，如果安全理事会断定由于本公约遭受违反而使本公约任何缔约国面临危险，即按照联合国宪章向请求援助的该缔约国提供援助或支持这种援助。

**第八条**

本公约中的任何规定均不得解释为在任何意义上限制或减损任何国家根据 1925 年 6 月 17 日在日内瓦签订的《禁止在战争中使用窒息性、毒性或其他气体和细菌作战方法的议定书》所承担的义务。

44.    中国也是 1925 年 6 月 17 日在日内瓦签订的**《禁止在战争中使用窒息性、毒性或其他气体和细菌作战方法的议定书》**（《日内瓦武器公约》）的成员。

45.    冠状病毒是一种病毒性疾病类别，通常类似于流感，但危害更大，致命性更强。

46.    冠状病毒变体在过去几年中已经广为人知。

47.    但是，2019 年 11 月 17 日，在中国中部的湖北省武汉市发现了一种新的军用武器冠状病毒变体，尽管政府记录的报告表明，尚不清楚是否早在那时已经确认为一种新疾病。Josephine Ma，"冠状病毒：中国首例 Covid-19 确诊病例可追溯至 11 月 17 日，《南华早报》，2020 年 3 月 13

8

案号：3:20-cv-00656-K   文件 1   提交日期：2020 年 3 月 17 日   第 9 页，共 19 页   页号9

日，可在以下网址查看：https://www.scmp.com/news/china/society/article/3074991/coronavirus-chinas-first-confirmed-covid-19-case-traced-back

48.    这种新病毒被命名为 COVID-19 或 SARS-CoV-2。

49.    第一例确诊 COVID-19 感染病例于 2019 年 12 月 8 日入院。*同上。*

50.    但是，武汉和中国各地的医生 "也被要求不要向公众披露任何有关这种新疾病的信息。" *同上。*

51.    COVID-19 是一种极其危险的疾病，因为它具有极强的攻击性，被设计为在人与人之间发生变异，传播非常迅速和容易。由于这是一种新疾病，所以还没有疫苗，传播方式还不能完全确定，治疗方法也只是在研究过程中，这种疾病的致命性似乎是流感的十倍。

52. 中国设计的 COVID-19 是一种非常 "有效" 的灾难性生物武器，可以杀死大量人口。

53.    普林斯顿大学的科学家正在进行同行评审，他们的研究表明，COVID-19 可以在空气中存活长达三个小时，并在空气中传播，可以在无生命的表面存活长达三天。见：John Bowden，"测试表明冠状病毒能在空气中存活"，<u>The Hill</u>，2020 年 3 月 11 日，可在以下网址查看：https://thehill.com/policy/healthcare/487110-tests-indicate-coronavirus-can-survive-in-the-air

54.    这使得 COVID-19 成为一种极为不寻常且危险的病毒，似乎为了能够通过多种途径快速传播而动过手脚。

55.    与此同时，除了疾病的性质外，还有许多迹象表明该病毒是在中国军方的一家或多家实验室中制造的

56.    中国领导人习近平在公开正式谈及中国应对 COVID- 19 的努力时，特别将防止未来类似威胁的努力与生物实验室安全联系起来。习说，实验室安全是一个 "国家安全" 问题。见：Steven Mosher，《<u>纽约邮报</u>》2020 年 2 月 22 日报道，"不要相信中国的故事：冠状病毒可能来自实验室泄漏，可在以下网址查看：//nypost.com/2020/02/22/dont-buy-chinas-story-the-coronavirus-may-have-leaked-from-a-lab/

案号：3:20-cv-00656-K　文件 1　提交日期：2020 年 3 月 17 日　第 10 页，共 19 页　页号10

57.　就在第二天，中国科技部发布了一项新的指令，题为：《关于加强新冠病毒高等级病毒微生物实验室生物安全管理的指导意见》。*同上。*

58.　因此，中国军方和国家领导层明确地将 COVID-19 的起源和传播与中国生物医学微生物实验室的安全规程和遏制联系起来。

59.　*《纽约邮报》* 在 Steven Mosher 的一篇文章中进一步揭示：

"这听起来确实像是中国没有办法把危险的病原体保存在试管中，不是吗？中国有多少"微生物实验室"处理"像新型冠状病毒那样的高级病毒"？

事实证明，在整个中国，只有一个。这仅有的一个位于中国城市武汉，刚好是……疫情的中心。

没错。中国唯一一配备有处理致命冠状病毒的四级微生物实验室，称为国家生物安全实验室，是武汉病毒研究所的组成部分。

*同上。*

60.　因此，中国政府一它控制着整个中国社会，而且对其他国家既不透明也不公开一已在官方声明中将武汉暴发的病毒疫情与加强湖北省武汉微生物实验室安全规程和安全措施的必要性关联在一起。

61.　据专家称，武汉病毒研究所用于中国的非法生物战武器项目：

"曾研究过中国生物战的以色列前军事情报官员 Dany Shoham 说，该研究所与北京的秘密生物武器计划有关。

\* \* \*

"中国否认拥有任何进攻性生物武器，但美国国务院去年的一份报告透露了对秘密生物战工作的怀疑。

\* \* \*

"当被问及新的冠状病毒是否可能已经泄漏时，Shoham 先生说："原则上，病毒向外扩散可能是通过泄漏发生，也可能通过正常离开有关设施的人的未被注意到的室内感染发生。武汉病毒研究所可能就是这种情况，但是到目前为止还没有证据或迹象表明发生了这样的事件。

Bill Gertz，*华盛顿时报*，2020 年 1 月 26 日，可在以下网址查看：
//www.washingtontimes.com/news/2020/jan/26/coronavirus-link-china-biowarfare- program-possible/

这位前以色列军事情报博士还表示，一些在加拿大工作的中国病毒学家通

10

过不正当方式向中国发送他所称的地球上最致命的病毒样本时，包括埃博拉病毒，外界对武汉病毒研究所产生了怀疑。

在《国防研究与分析研究所》杂志 7 月的一篇文章中，Shoham 先生说，武汉研究所是中国从事生物武器开发的四个实验室之一。

他说，该研究所下属的武汉国家生物安全实验室从事过埃博拉病毒、尼帕病毒和克里米亚-刚果出血热病毒的研究。

他说，武汉病毒研究所隶属于中国科学院，但其中的某些实验室"与解放军或中国国防机构中的生物武器相关单位有联系"。

\* \* \*

武汉生物制品研究所是一家民用机构，但与中国国防机构有联系。Shoham 先生说，该研究所被认为参与了中国生物武器公约计划。中国的非典疫苗可能就是在那里生产的。

*同上。*

"Shoham 先生拥有医学微生物学博士学位。1970 年到 1991 年，他曾任以色列军事情报局中东和世界生化战争高级分析员，拥有中校军衔。

\* \* \*

当被问及新型冠状病毒是否可能已经泄漏时，Shoham 先生说："原则上，病毒向外扩散可能是通过泄漏发生，也可能通过正常离开有关设施的人的未被注意到的室内感染发生。武汉病毒研究所可能就是这种情况，但是到目前为止还没有证据或迹象表明发生了这样的事件。"

Bill Gertz，华盛顿时报，2020 年 1 月 24 日，可在以下网址查看：
https://www.washingtontimes.com/news/2020/jan/24/virus-hit-wuhan-has-two-laboratories-linked-chines/

62.  许多知名人士、组织和专家由此得出结论，这场危机始于中国一所生物武器机构意外将

COVID-19 病毒释放到空气中。The Hill 的一个观点专栏写道：

"对 COVID-19 暴发的传统观点（也是最有可能的观点）是，它起源于中国武汉，靠近中国最先进的生物武器实验室，然后从那里扩散到全世界，而让人们去猜测它是起源于实验室的泄漏，来自野生蝙蝠或蛇，还是来自外来肉类市场。

Grady Means，"冠状病毒：生物恐怖主义蓝图，" The Hill，2020 年 3 月 9 日，可在以下网址查看：

https://thehill.com/opinion/national-security/485921-the-coronavirus-blueprint-for-bioterrorism

11

案号：3:20-cv-00656-K   文件 1   提交日期：2020 年 3 月 17 日   第 12 页，共 19 页   页号12

63. 据报道：

"第一例确诊患者*没有接触过市场*，这表明病毒可能来自其他地方，并被
运送到市场内，在那里繁衍并从人传到动物，然后再从动物传到人。"

Jackson Ryan，"冠状病毒和 COVID-19：回答你的所有问题，"Cnet.com，2020 年 3 月 11 日，"*病毒
来自哪里*"部分，可在以下网址查看：https://www.cnet.com/how-to/coronavirus-and-covid-19-all-
your-questions-answered/#wherefrom（*在原文中强调*）。

又*见*黄朝林教授（医学博士）、王业明（医学博士）、李兴旺教授（医学博士）、任丽丽教授（博士）、
赵建平教授（医学博士）、胡毅（医学博士）等的"武汉地区 2019 年新型冠状病毒感染者的临床特
征"，《柳叶刀》，第 395 卷，第 10223 期，2020 年 2 月 15 日，可在以下网址查看：
https://www.thelancet.com/journals/lancet/article/PIIS0140-6736(20)30183-5/fulltext#seccestitle170

64. 曾经尝试在中国传播关于新型 COVID-19 疾病的言论的人，包括医生和研究人员，
都被逮捕或"消失"了。

65. 2019 年 12 月 30 日，武汉的李文亮医生终于突破中国的审查制度，通过他的同学群
向国际社会发出了警告。

66. 随后，李医生被中国当局传唤和训诫，并被禁止继续发表言论。

67. 在接受《纽约时报》采访时，他解释说："如果官员们早点披露疫情信息，我认为情
况会好得多"，李博士告诉《纽约时报》。"应该更加开放和透明。"

68. 2020 年 2 月 6 日，李医生死于他努力与之抗争的疾病，这并非巧合。

69. 中国人民解放军军事医学科学院少将陈薇在 2003-2003 年抗击非典疫情和抗击埃博
拉病毒（包括 2014 年研发埃博拉疫苗）的过程中发挥了主导作用。

70. 但是，在中国军队中为减少疾病造成的损失所做的工作也为陈提供了为中国军队识
别、设计和储备最有效的生物武器方面所需的专业知识。

71. 为了将 COVID-19 病毒"放回瓶子里"，陈少将给自己和六名工作人员注射了一种尚
未在动物身上试验过的潜在疫苗，这的确令人惊讶。David Gilbert，"一名中国医生给自己注射了一
种 未 经 测 试 的 冠 状 病 毒 。"Vice，2020 年 3 月 4 日，可 在 以 下 网 址 查 看：

https://www.vice.com/en_us/article/v74p5y/a-chinese-doctor-injected-herself-with-an-untested-

coronavirus-vaccine

72.　因此，将一种可能有效的疫苗用在自己身上，陈少将的行为完全符合绝望的定义，

证明了她和她的国家犯下的罪行，即中国军方和所有被告（作为一致行动共同侵权人共同和分别）

造成了此次迅速蔓延的国家和世界性灾难。

**VI.　诉因**

### 第一诉因
### *协助及教唆将美国公民和该集体成员及子集体成员置于死亡或*
### *严重身体伤害的风险，*
### *违反了《美国法典》第 18 编第 2332(a) 条、《美国法典》第 18 编第 2332(b) 条、《美国法典》第 18*
### *编第 2332(c) 条和第 18 编第 2333 条，*

73.　原告和该集体及子集体的其他成员重复并重新指控前述各段的每一项指控，如同在此全

文陈述一样。

74.　通过本诉状指控的行为，被告（每一个被告作为共同侵权人，共同和分别地）正在实施

和/或协助和教唆以及密谋协助实施国际恐怖主义行为。

75.　每一个被告都为恐怖主义行为提供了实质性协助，违反了《美国法典》第 18 编第 2332 条

和第 18 编第 2332a 条。

76.　每一个被告都知道，或者不顾后果地无视了，其正在为实际上构成国际恐怖主义的行为

提供实质性支持。

77.　通过协助和教唆违反《美国法典》第 18 编第 2332 条的行为，造成了本诉状所述的损害，

并且至少使每个原告的人身、财产和/或业务处于紧迫的危险之中。

78.　根据《美国法典》第 18 编第 2333 条，被告作为共同侵权人，对原告因此类伤害而遭受的

任何和所有损害承担连带责任。

### 第二诉因
### *向恐怖分子提供实质性支持*
### *违反了《美国法典》第 18 编第 2339 条和第 18 编第 2333 条*

Case: 24-10454   Document: 4-1   Page: 59   Date Filed: 05/23/2024
Case 3:20-cv-00656-K-BK   Document 58   Filed 02/27/24   Page 48 of 55   PageID 660

案号：3:20-cv-00656-K   文件 1   提交日期：2020 年 3 月 17 日   第 14 页，共 19 页   页号14

79. 原告和该集体及子集体的每位成员重复并重新指控前述各段的每一项指控，如同在此全文陈述一样。

80. 每一个被告（每一个被告作为共同侵权人一致行动）都在为准备和实施许多实际上构成国际恐怖主义的行为提供实质性支持，这些行为使原告面临死亡或疾病的紧迫危险。

81. 因为参与违反《美国法典》第 18 编第 2339A 条的行为（该行为导致每个原告的人身、业务或财产受到伤害），根据《美国法典》第 18 编第 2333 条，被告共同和分别地对原告和该集体及子集体因本诉讼而遭受的任何及所有损害承担责任。

82. 由于对恐怖组织的这种支持，被告违反了国际法、既定的美国法律、国际法律、条约和规范，包括但不限于前文所列的条款：1994 年 12 月 9 日联合国大会通过的《消除国际恐怖主义措施宣言》及其引文（大会第 49/50 号决议）；《反恐怖法》，《美国法典》第 18 编第 113B 条；《反恐怖主义和有效死刑法》，第 104-132 号公共法律，110 Stat. 1214 (1996)；通过提供拦截和阻挠恐怖主义所需的适当工具来团结和加强美国 2001 年法案（"美国爱国者法案"），第 107-56 号公共法律，115 Stat. 271 (2001)；《防止及惩治灭绝种族罪公约》；第 2 条，1949 年 12 月 9 日，78 UNTS；《制止向恐怖主义提供资助的国际公约》，39 I.L.M. 270（1997 年 12 月 9 日）；联合国大会第 54/109 号决议，1 UN Doc A/RES/54/109（1999 年 12 月 1 日），已获 130 多个国家批准（《融资公约》）；《联合国宪章》，59 State.1031，3 Bevans 1153 (1945)；《世界人权宣言》，联合国大会决议 217A (iii), U.N. Doc.A/810 (1948)；《公民权利和政治权利国际公约》，联合国大会决议 2222A(xxi), 21 U.N. Doc.，《GAOR 补编》（第 16 号），载于 52 U.N. Doc.A 6316 (1966)；1949 年《日内瓦公约》共同条款 3；1997 年《日内瓦第二议定书》第 4 条和第 13 条；《禁止在国际商业交易中贿赂外国公职人员公约》，37 I.L.M. 1（1997 年 12 月 18 日）；和其他基本原则。

## 第三诉因

### 阴谋造成美国公民、该集体和子集体成员的伤害甚至死亡
### 违反了《美国法典》第 18 编第 2332(b) 条和第 2333 条

83. 原告和该集体及子集体的每位成员重复并重新指控前述各段的每一项指控，如同在此全文陈述一样。

84. 尽管 COVID-19 病毒看似是在计划和预期之外的时间泄漏的，但它是作为一种生物武器制备和储存的，目的是对付中国的假想敌，包括但不限于美国人民。

85. 尽管 COVID-19 病毒的作用和传播速度可能太慢，无法快速用于对抗敌方军队，但它被设计用于对付中国的一个或多个假想敌对国家的普通民众，例如美国。

86. 因此，被告（每一个被告作为共同侵权人，共同和分别地）制造和/或提纯并储存生物武器，其明确目的是使用此类武器对付其假想敌，包括但不限于美国人民。

87. 被告（每一个被告作为共同侵权人，共同和分别地）使用这些生物武器采取行动和/或合谋伤害美国公民。

88. 由于中国已在条约中认同此类武器属于非法，这些行动不能是中华人民共和国的官方政府行动，也不能主张任何可能的法律诉讼豁免。

89. 尽管 COVID-19 生物武器的实际释放似乎是无意行为，最初的目的也不是在实验室内部释放，但将病毒保存在实验室内的目的是将其用来杀害美国公民以及中国的假想敌对国家的其他个人和实体。

90. 因此，被告试图并确实伤害了美国公民，违反了《美国法典》第 18 编第 1113 条。

91. 每个原告和该集体和子集体的成员至少也被置于《美国法典》第 18 编第 2332 条和第 18 编第 2332a 条所禁止的人身、财产或业务的紧迫危险中。

92. 这些恐怖主义行为是极端的、令人发指的，目的是造成原告和该集体及子集体成员的极端身体疼痛和痛苦，以及经济损失。

15

案号：3:20-cv-00656-K　文件 1　提交日期：2020 年 3 月 17 日　第 16 页，共 19 页　页号16

93. 被告同意（包括通过暗示或共识）以本诉状中所述的方式彼此、与他们的代理人和其他人共谋行事，并采取了外在的行为以实施共谋。

94. 在所有相关时间，被告（每一个被告作为共同侵权人，共同和分别地）知道这一共谋，尤其是以往和现在都知道傀儡慈善组织及其领导人在实施这一共谋中所扮演的角色

95. 至少，被告不顾后果地无视了共谋的性质和目的。

96. 被告明知故犯，故意同意实施本诉状指控的行为，被告知道这些行为有助于实现他们的共同目标，并为此目的通过共谋鼓励和支持实质是恐怖主义活动的行为。

97. 通过共谋支持、鼓励和促进违反《美国法典》第 18 编第 2332 条的行为，对每个原告各自的人身、财产或业务造成了损害，根据《美国法典》第 18 编第 2333 条，被告（其中的每一个人，作为共同侵权人）应对原告和该集体及子集体成员因这些损害而遭受的任何和所有损害承担连带责任。

98. 通过鼓励和促进违反《美国法典》第 18 编第 2332a 条的行为，对每个主要原告、该集体及子集体的人身、财产、就业或业务造成了损害，根据《美国法典》第 18 编第 2333 条，被告（其中的每一个人）应对原告和该集体及子集体成员因这些非法行为而遭受的任何和所有损害承担连带责任。

### 第四诉因
#### 过失

99. 原告和该集体及子集体的每位成员重复并重新指控前述各段的每一项指控，如同在此全文陈述一样。

100. 每一个被告（每一个被告作为共同侵权人，共同和分别地），根据公约（原告和该集体和子集体的成员据此认为生物武器非法）负有以下义务：坚决销毁生物武器，避免制造或储存生物武器，并向其他条约成员报告所有已知事实，以避免生物武器的扩散或释放。

101. 根据中国加入的相关条约的条款，制造、提纯和/或维持 COVID-19 供应的行为本身就是非法和被禁止的。

102. 每个被告（作为共同侵权人，共同和分别地）负有一般注意义务，在处理非法生物武器（这些武器本身就是极其危险的材料）时，必须小心避免这些本质危险材料可预见的、自然的、不可避免的致命后果，否则几乎肯定会可预见地至少造成人命损失和严重伤害。

103. 被告违反其注意义务，在维持被禁止的非法生物武器时未能对意外释放提供足够的保护和保障，不顾后果地、肆意地、故意地给原告和该集体及子集体的其他成员造成不合理的死亡和危险疾病风险。

104. 每个被告（作为共同侵权人一致行动，共同和分别地）违反其注意义务，允许 COVID-19 病毒从中国武汉或其附近的实验室（即武汉病毒研究所或其分支机构）释放。

105. 作为被告（他们之中的每一个人作为共同侵权人一致行动，共同和分别）的肆意和不负责任的鲁莽和过失的一个直接后果，COVID- 19 的公开释放和传播已经导致原告和该集体和子集体的其他成员的生病、死亡、医疗费用、经济活动中断和损害、失业和其他重大损失，包括但不限于他们生活时间的损失和社会活动中断。

## 第五诉因
### 非正常死亡

106. 原告和该集体及子集体的成员重复并重新指控前述各段的每一项指控，如同在此全文陈述一样。

107. 被告（其中的每一个人作为共同侵权人，共同和分别地）对该集体中因 COVID-19 病毒感染而死亡的至少 41 名美国公民（仍在增加）和其他人负责。

108. 由于被告的不当行为，原告代表他们自己和他们的家庭，以及原告和该集体和子集体的成员及其中的死者，遭受了有意识的痛苦、折磨、严重的精神抑郁和死亡，并遭受了金钱和经济损失、丧失供养、丧失养育、照顾和指导、悲伤、痛苦、丧失服务、丧失社交和其他精神和身体伤害，甚至死亡。

17

## 第六诉因
### 袭击和伤害

109. 原告和该集体及子集体的成员重复并重新指控前述各段的每一项指控，如同在此全文陈述一样。

110. 被告（其中每一个人作为共同侵权人，共同和分别地）通过感染该集体成员的身体，对该集体和该子集体的成员，特别是子集体 1 和子集体 2 的成员造成了身体上的袭击和伤害。

111. 被告（其中的每一个人，共同和分别地）将子集体 1 和子集体 2 的所有成员置于对即将发生的伤害和/或死亡的合理恐惧中。

112. 由于被告的不当行为，原告和该集体及子集体的成员遭受了有意识的疼痛、痛苦、严重的精神痛苦和对即将发生的严重身体伤害或死亡、以及死亡的恐惧，并遭受了金钱和经济损失、丧失供养、丧失养育、照顾和指导、悲伤、痛苦、丧失服务、丧失社交以及其他精神和身体伤害。

### 救济请求

原告要求，经陪审团审判之后，对被告进行判决，要求每一个被告作为共同侵权人共同和分别地就其对原告和该集体和子集体造成的可证明的身体和精神伤害承担赔偿性和实际损害赔偿，并就其冷酷和不计后果的冷漠和恶意行为承担惩罚性损害赔偿，以及律师费、诉讼费，金额超过 20 万亿美元，另加法院认为公正和适当的其他救济。

### 是否要求陪审团

原告呈请陪审团对所有可审理的问题进行审判。

日期：2020 年 3 月 17 日

敬呈

/签名/ *Larry Klayman*

Larry Klayman 先生

本法院律师协会成员

Freedom Watch, Inc.

18

案号：**3:20-cv-00656-K** 文件 **1** 提交日期：**2020** 年 **3** 月 **17** 日 第 **19** 页，共 **19** 页 页号**19**

2020 Pennsylvania Avenue N.W.
Suite 345
Washington, D.C. 20006
(561) 558-5336
leklayman@gmail.com

代表原告本人和该集体及子集体其他
成员的律师

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS**

BUZZ PHOTOS
2414 W University, Suite 115D
McKinney, TX 75071

and

FREEDOM WATCH, INC.
2020 Pennsylvania Ave., Suite 345
Washington, D.C.  20006

and

LARRY KLAYMAN, a natural person

and

Members of the Class and Subclasses and
those Similarly Situated

*Plaintiffs,*

v.                                              Civil Action No. 3:20-cv-00656-K

THE PEOPLE'S REPUBLIC OF CHINA

and

THE PEOPLE'S LIBERATION ARMY
The official military of China

and

THE WUHAN INSTITUTE OF VIROLOGY
an agency of the Government of China

and

SHI ZHENGLI,
Director of the Wuhan Institute of Virology

and

---

MAJOR GENERAL CHEN WEI
of China's People's Liberation Army

*Defendants.*

## NOTICE OF SUIT

FOREIGN STATE ENTITY TO BE SERVED:
The Wuhan Institute of Virology
Xiao Hong Shan No. 44
Wuhan 43071
People's Republic of China

DOCUMENTS TO BE SERVED:
Hague Summary, Hague Summary Page 2
(WARNING), Summons, and Class Action
Complaint, with Chinese translations thereof.

NATURE OF ACTION:
The plaintiffs and class action members have
filed claims for damages and equitable relief
from the sovereign defendant, accusing the
People's Republic of China and its agencies
and officials of creating and publishing the
coronavirus variant COVID-19 as a biological
and chemical weapon that violates China's
international treaties and agreements.

RESPONSE REQUIREMENTS:
In accordance with Sec. 1608(d) of Title 28,
United States Code, the foreign sovereign
defendant has **60 days** in which to file a
response with the court, and serve a copy of
their response upon the plaintiff's counsel, after
receipt of the aforementioned documents
above.  Failure to respond within **60 days** can
result in a default ruling for the remedies
sought.

JURISDICTION:
Pursuant to the FOREIGN SOVEREIGN
IMMUNITIES ACT OF 1976 (Title 28 United
States Code (U.S.C.))[1], the above-named
sovereign defendant as described in this matter
can be defined as a "foreign state" under
§1603(a) of Title 28, U.S.C., and shall not be
immune from the jurisdiction of this court.

---

[1] Copy of Foreign Sovereign Immunities Act (Pub. L. 94-583, 90 Stat. 2891, 28 U.S.C. Sec. 1330, 1332(a), 1391(f) and 1601-1611) attached

---

Notice of Suit
In accordance with the Foreign Sovereign Immunities Act

Page 2 of 2

美国联邦地区法院
德克萨斯州北区

BUZZ PHOTOS
2414 W University, Suite 115D
McKinney, TX 75071

及

FREEDOM WATCH, INC.
2020 Pennsylvania Ave., Suite 345
Washington, D.C.. 20006

及

LARRY KLAYMAN，自然人

及

集体和子集体的成员以及类似处境的人士

原告，

诉

**中华人民共和国**

及

**中国人民解放军**
中国国家武装力量

及

**武汉病毒研究所，**
一家中国政府机构

及

**石正丽，**
武汉病毒研究所主任

及

陈薇，中国人民解放军少将

被告。

民事诉讼编号：3:20-cv-00656-K

起诉通知
根据外国主权豁免法

**诉讼通知**

有待送达之外国实体:                         武汉病毒研究所
小红山 44 号
武汉 43071
中华人民共和国

有待送达之文件:                         海牙摘要、海牙摘要第 2 页（警告）、传
票和集体诉讼投诉，及其中文翻译

诉讼性质:                          原告和集体诉讼成员已向主权被告提出损害
赔偿和衡平法救济要求，指控中华人民共和
国及其机构和官员通过制造和发布冠状病毒
变种 COVID-19 作为违反中国的国际条约和
协议 生化武器

答辩要求:                          根据《美国法典》第 28 部分第 1608(d)
节，外国主权被告在收到上述文件以后有
**60 天**时间向法院提交答辩状，并将其答辩
状送达原告律师。在 **60 天**之内未作出答辩
可能导致法院按照救济要求做出缺席判
决。

司法管辖权:                       根据 1976 年《外国主权豁免法》（美国法典
第 28 条（USC）*），本案中描述的上述主权
被告可根据第 28 条第 1603(a) 条被定义为
"外国"，USC, 并且不应免受本法院的管辖

---

[1] 附有外国主权豁免法 (公法 94-583, 90 成文法 2891, 《美国法典》第 28 章第 1330, 1332(a), 1391(f) 和 1601-1611) 节之文本

---

# FOREIGN SOVEREIGN IMMUNITIES ACT
## TITLE 28 UNITED STATES CODE
### Sec. 1330, 1332(a), 1391(f) and 1601-1611
### and
### SHORT TITLE OF 1976 AMENDMENTS Pub. L. 94-583,

## TITLE 28

**Sec. 1330**. Actions against foreign states

•(a) The district courts shall have original jurisdiction without regard to amount in controversy of any nonjury civil action against a foreign state as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement.

•(b) Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) where service has been made under section 1608 of this title.

•(c) For purposes of subsection (b), an appearance by a foreign state does not confer personal jurisdiction with respect to any claim for relief not arising out of any transaction or occurrence enumerated in sections 1605-1607 of this title.  -SOURCE-  (Added Pub. L. 94-583, Sec. 2(a), Oct. 21, 1976, 90 Stat. 2891.) EFFECTIVE DATE  Section effective 90 days after Oct. 21, 1976, see section 8 of Pub. L. 94-583, set out as a note under section 1602 of this title.

**Sec. 1332.** - Diversity of citizenship; amount in controversy; costs

•(a) The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between -

   •(1) citizens of different States;

   •(2) citizens of a State and citizens or subjects of a foreign state;

   •(3) citizens of different States and in which citizens or subjects of a foreign state are additional parties; and

   •(4) a foreign state, defined in section 1603(a) of this title, as plaintiff and citizens of a State or of different States.

For the purposes of this section, section 1335, and section 1441, an alien admitted to the United States for permanent residence shall be deemed a citizen of the State in which such alien is domiciled.

•(b) Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff who files the case originally in the Federal courts is finally adjudged to be entitled to recover less than the sum or value of $75,000, computed without regard to any setoff or counterclaim to which the defendant may be adjudged to be entitled, and exclusive of interest and costs, the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff.

•(c) For the purposes of this section and section 1441 of this title -
   •(1) a corporation shall be deemed to be a citizen of any State by which it has been incorporated and of the State where it has its principal place of business, except that in any direct action against the insurer of a policy or contract of liability insurance, whether incorporated or unincorporated, to which action the insured is not joined as a party-defendant, such insurer shall be deemed a citizen of the State of which the insured is a citizen, as well as of any State by which the insurer has been incorporated and of the State where it has its principal place of business; and
   •(2) the legal representative of the estate of a decedent shall be deemed to be a citizen only of the same State as the decedent, and the legal representative of an infant or incompetent shall be deemed to be a citizen only of the same State as the infant or incompetent.
•(d) The word "States", as used in this section, includes the Territories, the District of Columbia, and the Commonwealth of Puerto Rico

**Sec. 1391**. Venue generally

•(f) A civil action against a foreign state as defined in section 1603(a) of this title may be brought –
   •(1) in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated;
   •(2) in any judicial district in which the vessel or cargo of a foreign state is situated, if the claim is asserted under section 1605(b) of this title;
   •(3) in any judicial district in which the agency or instrumentality is licensed to do business or is doing business, if the action is brought against an agency or instrumentality of a foreign state as defined in section 1603(b) of this title; or
   •(4) in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof.

**Section 1602.** Findings and declaration of purpose

The Congress finds that the determination by United States courts of the claims of foreign states to immunity from the jurisdiction of such courts would serve the interests of justice and would protect the rights of both foreign states and litigants in United States courts. Under international law, states are not immune from the jurisdiction of foreign courts insofar as their commercial activities are concerned, and their commercial property may be levied upon for the satisfaction of judgments rendered against them in connection with their commercial activities. Claims of foreign states to immunity should henceforth be decided by courts of the United States and of the States in conformity with the principles set forth in this chapter.

**Sec. 1603**. Definitions

For purposes of this chapter -

•(a) A "foreign state", except as used in section 1608 of this title, includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state as defined in subsection (b).

•(b) An "agency or instrumentality of a foreign state" means any entity -
    •(1) which is a separate legal person, corporate or otherwise, and
    •(2) which is an organ of a foreign state or political subdivision thereof, or a
        majority of whose shares or other ownership interest is owned by a foreign
        state or political subdivision thereof, and
        •(3) which is neither a citizen of a State of the United States as defined in
section 1332 (c) and (d) of this title, nor created under the laws of any third country.

•(c) The "United States" includes all territory and waters, continental or insular, subject to the jurisdiction of the United States.

•(d) A "commercial activity" means either a regular course of commercial conduct or a particular commercial transaction or act. The commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose.

•(e) A "commercial activity carried on in the United States by a foreign state" means commercial activity carried on by such state and having substantial contact with the United States.

**Section 1604.** Immunity of a foreign state from jurisdiction

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of this chapter.

**Sec. 1605**. General exceptions to the jurisdictional immunity of a foreign state

•(a) A foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case -
    •(1) in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver;
    •(2) in which the action is based upon a commercial activity carried on in the United States by the foreign state; or upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or upon an act outside the

territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States;

•(3) in which rights in property taken in violation of international law are in issue and that property or any property exchanged for such property is present in the United States in connection with a commercial activity carried on in the United States by the foreign state; or that property or any property exchanged for such property is owned or operated by an agency or instrumentality of the foreign state and that agency or instrumentality is engaged in a commercial activity in the United States;

•(4) in which rights in property in the United States acquired by succession or gift or rights in immovable property situated in the United States are in issue;

•(5) not otherwise encompassed in paragraph (2) above, in which money damages are sought against a foreign state for personal injury or death, or damage to or loss of property, occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment; except this paragraph shall not apply to –

•(A) any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function regardless of whether the discretion be abused, or

•(B) any claim arising out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights;

•(6) in which the action is brought, either to enforce an agreement made by the foreign state with or for the benefit of a private party to submit to arbitration all or any differences which have arisen or which may arise between the parties with respect to a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration under the laws of the United States, or to confirm an award made pursuant to such an agreement to arbitrate, if

•(A) the arbitration takes place or is intended to take place in the United States,

•(B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards,

• (C) the underlying claim, save for the agreement to arbitrate, could have been brought in a United States court under this section or section 1607, or •

• (D) paragraph (1) of this subsection is otherwise applicable; or

•(7) not otherwise covered by paragraph (2), in which money damages are sought against a foreign state for personal injury or death that was caused by an act of torture, extrajudicial killing, aircraft sabotage, hostage taking, or the provision of material support or resources (as defined in section 2339A of title 18) for such an act if such act or provision of material support is engaged in by an official, employee, or agent of such foreign state while acting within the scope of his or her office, employment, or agency, except that the court shall decline to hear a claim under this paragraph –

•(A) if the foreign state was not designated as a state sponsor of terrorism under section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)) or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371) at the time the act occurred, unless later so designated as a result of such act; and

•(B) even if the foreign state is or was so designated, if –

•(i) the act occurred in the foreign state against which the claim has been brought and the claimant has not afforded the foreign state a reasonable opportunity to arbitrate the claim in accordance with accepted international rules of arbitration; or

•(ii) the claimant or victim was not a national of the United States (as that term is defined in section 101(a)(22) of the Immigration and Nationality Act) when the act upon which the claim is based occurred.

•(b) A foreign state shall not be immune from the jurisdiction of the courts of the United States in any case in which a suit in admiralty is brought to enforce a maritime lien against a vessel or cargo of the foreign state, which maritime lien is based upon a commercial activity of the foreign state: Provided, That –

•(1) notice of the suit is given by delivery of a copy of the summons and of the complaint to the person, or his agent, having possession of the vessel or cargo against which the maritime lien is asserted; and if the vessel or cargo is arrested pursuant to process obtained on behalf of the party bringing the suit, the service of process of arrest shall be deemed to constitute valid delivery of such notice, but the party bringing the suit shall be liable for any damages sustained by the foreign state as a result of the arrest if the party bringing the suit had actual or constructive knowledge that the vessel or cargo of a foreign state was involved; and

•(2) notice to the foreign state of the commencement of suit as provided in section 1608 of this title is initiated within ten days either of the delivery of notice as provided in paragraph (1) of this subsection or, in the case of a party who was unaware that the vessel or cargo of a foreign state was involved, of the date such party determined the existence of the foreign state's interest.

•(c) Whenever notice is delivered under subsection (b)(1), the suit to enforce a maritime lien shall thereafter proceed and shall be heard and determined according to the principles of law and rules of practice of suits in rem whenever it appears that, had the vessel been privately owned and possessed, a suit in rem might have been maintained. A decree against the foreign state may include costs of the suit and, if the decree is for a money judgment, interest as ordered by the court, except that the court may not award judgment against the foreign state in an amount greater than the value of the vessel or cargo upon which the maritime lien arose. Such value shall be determined as of the time notice is served under subsection (b)(1). Decrees shall be subject to appeal and revision as provided in other cases of admiralty and maritime jurisdiction. Nothing shall preclude the plaintiff in any proper case from seeking relief in personam in the same action brought to enforce a maritime lien as provided in this section.

•(d) A foreign state shall not be immune from the jurisdiction of the courts of the United States in any action brought to foreclose a preferred mortgage, as defined in the Ship Mortgage Act, 1920 (46 U.S.C. 911 and following). Such action shall be brought, heard, and determined in accordance with the provisions of that Act and in accordance with the principles of law and rules of practice of suits in rem, whenever it appears that had the vessel been privately owned and possessed a suit in rem might have been maintained.

•(e) For purposes of paragraph (7) of subsection (a) –

•(1) the terms "torture" and "extrajudicial killing" have the meaning given those terms in section 3 of the Torture Victim Protection Act of 1991;

•(2) the term "hostage taking" has the meaning given that term in Article 1 of the International Convention Against the Taking of Hostages; and

•(3) the term "aircraft sabotage" has the meaning given that term in Article 1 of the Convention for the Suppression of Unlawful Acts Against the Safety of Civil Aviation.

•(f) No action shall be maintained under subsection (a)(7) unless the action is commenced not later than 10 years after the date on which the cause of action arose. All principles of equitable tolling, including the period during which the foreign state was immune from suit, shall apply in calculating this limitation period.

•(g) Limitation on Discovery. –

•(1) In general. –

• (A) Subject to paragraph (2), if an action is filed that would otherwise be barred by section 1604, but for subsection (a)(7), the court, upon request of the Attorney General, shall stay any request, demand, or order for discovery on the United States that the Attorney General certifies would significantly interfere with a criminal investigation or prosecution, or a national security operation, related to the incident that gave rise to the cause of action, until such time as the Attorney General advises the court that such request, demand, or order will no longer so interfere.

•(B) A stay under this paragraph shall be in effect during the 12-month period beginning on the date on which the court issues the order to stay discovery. The court shall renew the order to stay discovery for additional 12-month periods upon motion by the United States if the Attorney General certifies that discovery would significantly interfere with a criminal investigation or prosecution, or a national security operation, related to the incident that gave rise to the cause of action.

•(2) Sunset. –

• (A) Subject to subparagraph (B), no stay shall be granted or continued in effect under paragraph (1) after the date that is 10 years after the date on which the incident that gave rise to the cause of action occurred.

•(B) After the period referred to in subparagraph (A), the court, upon request of the Attorney General, may stay any request, demand, or order for discovery on the United States that the court finds a substantial likelihood would –

•(i) create a serious threat of death or serious bodily injury to any person;

•(ii) adversely affect the ability of the United States to work in cooperation with foreign and international law enforcement agencies in investigating violations of United States law; or

•(iii) obstruct the criminal case related to the incident that gave rise to the cause of action or undermine the potential for a conviction in such case.

•(3) Evaluation of evidence. - The court's evaluation of any request for a stay under this subsection filed by the Attorney General shall be conducted ex parte and in camera.

•(4) Bar on motions to dismiss. - A stay of discovery under this subsection shall constitute a bar to the granting of a motion to dismiss under rules 12(b)(6) and 56 of the Federal Rules of Civil Procedure.

•(5) Construction. - Nothing in this subsection shall prevent the United States from seeking protective orders or asserting privileges ordinarily available to the United States.

**Section 1606.** Extent of liability

As to any claim for relief with respect to which a foreign state is not entitled to immunity under section 1605 or 1607 of this chapter, the foreign state shall be liable in the same manner and to the same extent as a private individual under like circumstances; but a foreign state except for an agency or instrumentality thereof shall not be liable for punitive damages, except any action under section 1605(a)(7) or 1610(f); if, however, in any case wherein death was caused, the law of the place where the action or omission occurred provides, or has been construed to provide, for damages only punitive in nature, the foreign state shall be liable for actual or compensatory damages measured by the pecuniary injuries resulting from such death which were incurred by the persons for whose benefit the action was brought.

**Section 1607.** Counterclaims

In any action brought by a foreign state, or in which a foreign state intervenes, in a court of the United States or of a State, the foreign state shall not be accorded immunity with respect to any counterclaim
•(a) for which a foreign state would not be entitled to immunity under section 1605 of this chapter had such claim been brought in a separate action against the foreign state; or
•(b) arising out of the transaction or occurrence that is the subject matter of the claim of the foreign state; or  (c) to the extent that the counterclaim does not seek relief exceeding in amount or differing in kind from that sought by the foreign state.

**Sec. 1608.** Service; time to answer; default

•(a) Service in the courts of the United States and of the States shall be made upon a foreign state or political subdivision of a foreign state:
　•(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the foreign state or political subdivision; or
　•(2) if no special arrangement exists, by delivery of a copy of the summons and complaint in accordance with an applicable international convention on service of judicial documents; or
　•(3) if service cannot be made under paragraphs (1) or (2), by sending a copy of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the head of the ministry of foreign affairs of the foreign state concerned, or
　•(4) if service cannot be made within 30 days under paragraph (3), by sending two copies of the summons and complaint and a notice of suit, together with a translation of each into the official language of the foreign state, by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the Secretary of State in Washington, District of Columbia, to the attention of the Director of Special Consular Services - and the Secretary shall transmit one copy of the papers through diplomatic

channels to the foreign state and shall send to the clerk of the court a certified copy of the diplomatic note indicating when the papers were transmitted. As used in this subsection, a "notice of suit" shall mean a notice addressed to a foreign state and in a form prescribed by the Secretary of State by regulation.

•(b) Service in the courts of the United States and of the States shall be made upon an agency or instrumentality of a foreign state:
   •(1) by delivery of a copy of the summons and complaint in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality; or
   •(2) if no special  arrangement exists, by delivery of a copy of the summons and complaint either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States; or in accordance with an applicable international convention on service of judicial documents; or
   •(3) if service cannot be made under paragraphs (1) or (2), and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state -
      •(A) as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request or
      •(B) by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or
      •(C) as directed by order of the court consistent with the law of the place where service is to be made.

•(c) Service shall be deemed to have been made -
   •(1) in the case of service under subsection (a)(4), as of the date of transmittal indicated in the certified copy of the diplomatic note; and
   •(2) in any other case under this section, as of the date of receipt indicated in the certification, signed and returned postal receipt, or other proof of service applicable to the method of service employed.

•(d) In any action brought in a court of the United States or of a State, a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state shall serve an answer or other responsive pleading to the complaint within sixty days after service has been made under this section.

•(e) No judgment by default shall be entered by a court of the United States or of a State against a foreign state, a political subdivision thereof, or an agency or instrumentality of a foreign state, unless the claimant establishes his claim or right to relief by evidence satisfactory to the court. A copy of any such default judgment shall be sent to the foreign state or political subdivision in the manner prescribed for service in this section.

**Section 1609.** Immunity from attachment and execution of property of a foreign state

Subject to existing international agreements to which the United States is a party at the time of enactment of this Act the property in the United States of a foreign state shall be

immune from attachment arrest and execution except as provided in sections 1610 and 1611 of this chapter.

**Section 1610.** Exceptions to the immunity from attachment or execution

•(a) The property in the United States of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if

•(1) the foreign state has waived its immunity from attachment in aid of execution or from execution either explicitly or by implication, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, or

•(2) the property is or was used for the commercial activity upon which the claim is based, or

•(3) the execution relates to a judgment establishing rights in property which has been taken in violation of international law or which has been exchanged for property taken in violation of international law, or

•(4) the execution relates to a judgment establishing rights in property –

•(A) which is acquired by succession or gift, or

•(B) which is immovable and situated in the United States:  Provided, That such property is not used for purposes of  maintaining a diplomatic or consular mission or the residence  of the Chief of such mission, or

•(5) the property consists of any contractual obligation or any proceeds from such a contractual obligation to indemnify or hold harmless the foreign state or its employees under a policy of automobile or other liability or casualty insurance covering the claim which merged into the judgment, or

•(6) the judgment is based on an order confirming an arbitral award rendered against the foreign state, provided that attachment in aid of execution, or execution, would not be inconsistent with any provision in the arbitral agreement, or

•(7) the judgment relates to a claim for which the foreign state is not immune under section 1605(a)(7), regardless of whether the property is or was involved with the act upon which the claim is based.

•(b) In addition to subsection (a), any property in the United States of an agency or instrumentality of a foreign state engaged in commercial activity in the United States shall not be immune from attachment in aid of execution, or from execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if

•(1) the agency or instrumentality has waived its immunity from attachment in aid of execution or from execution either explicitly or implicitly, notwithstanding any withdrawal of the waiver the agency or instrumentality may purport to effect except in accordance with the terms of the waiver, or

•(2) the judgment relates to a claim for which the agency or instrumentality is not immune by virtue of section 1605(a)(2), (3), (5), or (7), or 1605(b) of this chapter, regardless of whether the property is or was involved in the act upon which the claim is based.

•(c) No attachment or execution referred to in subsections (a) and (b) of this section shall be permitted until the court has ordered such attachment and execution after having determined that a reasonable period of time has elapsed following the entry of judgment and the giving of any notice required under section 1608(e) of this chapter.

•(d) The property of a foreign state, as defined in section 1603(a) of this chapter, used for a commercial activity in the United States, shall not be immune from attachment prior to the entry of judgment in any action brought in a court of the United States or of a State, or prior to the elapse of the period of time provided in subsection (c) of this section, if

     •(1) the foreign state has explicitly waived its immunity from attachment prior to judgment, notwithstanding any withdrawal of the waiver the foreign state may purport to effect except in accordance with the terms of the waiver, and

     •(2) the purpose of the attachment is to secure satisfaction of a judgment that has been or may ultimately be entered against the foreign state, and not to obtain jurisdiction.

•(e) The vessels of a foreign state shall not be immune from arrest in rem, interlocutory sale, and execution in actions brought to foreclose a preferred mortgage as provided in section 1605(d).

•(f)     •(1)     •(A) Notwithstanding any other provision of law, including but not limited to section 208(f) of the Foreign Missions Act (22 U.S.C. 4308(f)), and except as provided in subparagraph (B), any property with respect to which financial transactions are prohibited or regulated pursuant to section 5(b) of the Trading with the Enemy Act (50 U.S.C. App. 5(b)), section 620(a) of the Foreign Assistance Act of 1961 (22 U.S.C. 2370(a)), sections 202 and 203 of the International Emergency Economic Powers Act (50 U.S.C. 1701-1702), or any other proclamation, order, regulation, or license issued pursuant thereto, shall be subject to execution or attachment in aid of execution of any judgment relating to a claim for which a foreign state (including any agency or instrumentality or such state) claiming such property is not immune under section 1605(a)(7).

          •(B) Subparagraph (A) shall not apply if, at the time the property is expropriated or seized by the foreign state, the property has been held in title by a natural person or, if held in trust, has been held for the benefit of a natural person or persons.

     •(2)     •(A) At the request of any party in whose favor a judgment has been issued with respect to a claim for which the foreign state is not immune under section 1605(a)(7), the Secretary of the Treasury and the Secretary of State shall fully, promptly, and effectively assist any judgment creditor or any court that has issued any such judgment in identifying, locating, and executing against the property of that foreign state or any agency or instrumentality of such state.

          •(B) In providing such assistance, the Secretaries -  (i) may provide such information to the court under seal; and  (ii) shall provide the information in a manner sufficient to allow the court to direct the United States Marshall's office to promptly and effectively execute against that property.

## Section 1611. Certain types of property immune from execution

•(a) Notwithstanding the provisions of section 1610 of this chapter, the property of those organizations designated by the President as being entitled to enjoy the privileges, exemptions, and immunities provided by the International Organizations Immunities Act

shall not be subject to attachment or any other judicial process impeding the disbursement of funds to, or on the order of, a foreign state as the result of an action brought in the courts of the United States or of the States.

•(b) Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution, if - (1) the property is that of a foreign central bank or monetary authority held for its own account, unless such bank or authority, or its parent foreign government, has explicitly waived its immunity from attachment in aid of execution, or from execution, notwithstanding any withdrawal of the waiver which the bank, authority or government may purport to effect except in accordance with the terms of the waiver; or (2) the property is, or is intended to be, used in connection with a military activity and (A) is of a military character, or (B) is under the control of a military authority or defense agency.

•(c) Notwithstanding the provisions of section 1610 of this chapter, the property of a foreign state shall be immune from attachment and from execution in an action brought under section 302 of the Cuban Liberty and Democratic Solidarity (LIBERTAD) Act of 1996 to the extent that the property is a facility or installation used by an accredited diplomatic mission for official purposes.

------------------

## SHORT TITLE OF 1976 AMENDMENTS Pub. L. 94-583
**Section 1**, Oct. 21, 1976, 90 Stat. 2891, provided: "That this Act (enacting sections 1330 and 1602 to 1611 of this title, amending sections 1332, 1391, and 1441 of this title, and enacting provisions set out as notes under section 1602 of this title) may be cited as the 'Foreign Sovereign Immunities Act of 1976'." SOURCE Added Pub. L. 94-583, Sec. 4(a), Oct. 21, 1976, 90 Stat. 2892.

## SEPARABILITY
**Section 7** of Pub. L. 94-583 provided that: "If any provision of this Act (enacting this chapter and section 1330 of this title, amending sections 1332, 1391, and 1441 of this title, and enacting provisions set out as notes under this section and section 1 of this title) or the application thereof to any foreign state is held invalid, the invalidity does not affect other provisions or applications of the Act which can be given effect without the invalid provision or application, and to this end the provisions of this Act are severable."

## EFFECTIVE DATE
**Section 8** of Pub. L. 94-583 provided that: "This Act (enacting this chapter and section 1330 of this title, amending sections 1332, 1391, and 1441 of this title, and enacting provisions set out as notes under this section and section 1 of this title) shall take effect ninety days after the date of its enactment (Oct. 21, 1976)."

## SHORT TITLE
For short title of Pub. L. 94-583 as the "Foreign Sovereign Immunities Act of 1976", see section 1 of Pub. L. 94-583, set out as a Short Title of 1976 Amendments note under section 1 of this title.

外国最高主权豁免权法
美国法典标题第 28
第 1330, l332(a), 1391(f) 和 1601-1611 节
以及
1976 修改出版物第 94-583 行的简略标题

**标题第 28**

**第 1330 节. 对外国的诉讼**

•(a) 如在本标题第 1603(a) 节内就任何不管是根据本标题第 1605-1607 节的内容还是根据任何适用的国际协议, 外国均无权对其享有豁免权的对人的救济要求所规定的那样, 地区法院应拥有对外国的初审法律管辖权而不考虑任何非陪审团民事诉讼的争议金额。

•(b) 对于外国的对人管辖权应存在于每一项对救济的要求, 地区法院对这些小节(a)内已经按照本标题内第 1608 节实施了送达的救济要求拥有法律管辖权。

•(c) 为了小节 (b) 之目的, 外国的出庭并不给予和任何并非由于本标题第 1605-1607 节内所列举的任何事项或事件而引起的救济要求有关的对人管辖权。-来源- (附加出版物, 第 94-583 行, 第 2(a) 节, 1976 年 10 月 21 日, 90 成文法 2891.) **生效日期**  本节生效于 1976 年 10 月 21 日之后的 90 天, 见出版第 94-583 行作为本标题第 1602 节下一个注解提出的第 8 节。

**第 1332 节. -公民权的多样性; 争议的金额; 费用**

•(a) 地区法院应对其争议事项的总值超过 75,000 美元, 其中不包含利息和费用, 而且争议事项发生于以下两方之间的所有民事诉讼拥有初审法律管辖权:
  •(1) 不同国家的公民;
  •(2) 某个州的公民和某个外国的公民或主体;
  •(3) 几个不同州的公民而且其中某个外国的公民或主体是额外的当事人者; 以及
  •(4) 在本标题第1603(a) 节内所规定的, 作为原告的外国和某一个州或几个不同州的公民。

为了本节、第 1335 节和第 1441 节之目的, 允许进入美国永久居留的外国人应被认为是该外国人定居地点所在州的公民。

•(b) 除了在美国的成文法律内为此另有明确规定以外, 若最初向联邦法院提出讼案的原告最终被判有权获得赔偿的金额或价值少于 75,000 美元, 估算时不考虑任何抵偿或被告可能被判有权反诉, 并且不包括利息和费用者, 地区法院可以否决原告的费用要求另外还可以使原告承受费用。

•(c) 为了本节和本标题第1441节之目的:

> •(1) 公司应被认为是它在其中已经组建公司并且在该州有主要营业地的任何州的公民，除非是在针对保单的保险人或责任保险契约的其中被保险人不被共同作为当事人被告的任何直接诉讼中，不管是已组建公司或未组建公司的，该保险人应被认为是被保险人在其中是一名公民的所在州的公民，以及保险人在其中已经组建公司并且在该州有主要营业地的任何州的一名公民；以及

> •(2) 死者财产的法定代表应只能被认为是死者相同州的公民，而儿童或无行为能力者的法定代表应只能被认为是儿童或无行为能力者相同州的公民。

•(d) 本节内所使用的词"州"，包括)准地区、哥伦比亚特区和波多黎各自由邦。

**第 1391 节. 一般审判地点**

•(f) 按本标题第 1603(a) 节之规定对外国的民事诉讼可以在以下地点进行:

> •(1) 在导致发生赔偿要求的事件或不作为的主要部分所在的，或者作为诉讼主体财产的主要部分所在的任何司法地区内；

> •(2) 如果索赔根据本标题第 1605(b) 节得到证实的话，则在外国船只或货物所在的任何司法地区内；

> •(3) 如果诉讼是针对按本标题第 1603(b) 节内所规定的外国代理人或机构进行的话，则在该外国代理人或机构获准从事经营或正在从事经营的司法地区内；或

> •(4) 如果诉讼是针对某个外国或其政治属地进行的话，则在哥伦比亚特区的美国地区法院内。

**第 1602 节. 调查结果和目的之说明**

国会发现由美国法院做出外国要求免受该法院法律管辖权的豁免权的决定可能有助于公正并可能保护外国和美国法院内诉讼当事人两者的正当权益。根据国际法，国家在涉及到其商业活动的范围之内不能被免受外国法院的法律管辖权，并且它们的商业财产可能被扣押以执行和他们的商业活动有关而对他们作出的判决。外国对于豁免权的要求今后将由美国和各州的法院依据本章所阐明的原则来决定。

**第 1603 节**. 定义

为了本章之目的:

- (a)"外国", 除了在本标题第 1608 节内所使用的以外, 包括小节 (b) 内所规定的外国的政治属地或外国的代理人或机构。

- (b) "外国的代理人或机构"是指任何实体:
  - (1) 它是一个公司或其他形式的独立法人, 以及
  - (2) 它是一个外国的机关或其政治属地, 或其大部分股份或其他所有权利益为外国或其政治属地所拥有者, 以及
  - (3) 它既不是本标题第 1332 (c) 和 (d) 节内所规定的美国某一个州的公民, 也不是根据任何第三国的法律所创建的。

- (c) 按照美国的法律管辖权, "美国"包括大陆或岛在内的所有领土和领海。

- (d) "商业活动"是指商业行为的正常过程或特定的商业交易或行动。某一活动的商业特性应视行为过程或特定交易或行动的性质而定, 而非由其目的决定的。

- (e) "外国在美国进行的商业活动"是指该国进行的商业活动并和美国具有实质上的联系。

**第 1604 节.**外国免受法律管辖权的豁免权

以美国作为一个当事方的现有国际协议为准, 在本法令颁布之时外国应享有免受美国和各州法院的司法管辖权的豁免权, 除了在本章第 1605 到 1607 节内所规定的之外。

**第 1605 节**. 外国享有司法豁免权的一般例外

- (a) 凡符合以下任何情况者, 外国不应享有美国和各州法院的司法豁免权:
  - (1) 其中外国已经明示或暗示地放弃其豁免权, 尽管外国可能除了按照弃权条款以外打算实施弃权的任何撤回;
  - (2) 其中的诉讼是基于该外国在美国进行的商业活动者; 或基于在美国实施的并与外国在别处的商业活动有关的行动; 或基于在美国领土以外的并与外国在别处的商业活动有关的行动, 而且该行动在美国产生直接影响的;

•(3) 其中违反国际法而行使的财产权是有争议的而且该财产或为了该财产而交换的任何财产存在于美国并和外国在美国进行的商业活动有关者；或该财产或为了该财产而交换的任何财产是由外国的代理人或机构所拥有或经营的并且该代理人或机构参与了在美国的商业活动；

•(4) 其中在美国通过继承或赠与或位于美国的不动产权获得的财产权是有争议的；

•(5) 对于尚未另行包括在以上第（2）段内者，其中为了人身伤害或死亡、或财产的损坏或遗失而向外国索取的金钱赔偿，而这些人身伤害或死亡或财产的损坏或遗失系发生于美国并且是由该外国或该外国的任何主管或雇员在其职责范围内或雇佣期间实施的民事侵害行为或不作为造成的；除了本段内容不应适用者以外：

  •(A) 任何基于行使或履行，或未能行使或履行任意决定的职责的权利要求而不管该任意决定权是否被滥用，或

  •(B) 任何由恶意起诉、过程的滥用、诽谤、中伤、告知不实、欺骗或阻碍契约权利而引起的权利要求；

•(6) 其中诉讼的提出是为了强制执行一项由外国和私人当事人或者是为了私人当事人的利益而达成的协议把所有或任何已经产生的或可能在当事人之间产生的、和规定的法律关系有关的分歧，不管是不是契约性的、有关能按美国法律通过仲裁解决的主题提交仲裁，或者是为了确认根据该进行仲裁的协议而作出的一项裁决，如果

  •(A) 该仲裁在美国进行或计划在美国进行，

  •(B) 该协议或裁决受到或可能受到要求承认并强制执行仲裁裁定的某个条约或在美国有效的其他国际协议的支配者，

  •(C) 为了仲裁协议而保留的下面的权利要求可能已经根据本节或第 1607 节向美国的法院提出者，或

  •(D) 本小节的第 (1) 段是在其他方面适用的；或

•(7) 对于未在第（2）段内另有包括者，其中为了由于虐待行为、与司法无关的杀害、航空器破坏活动、扣押人质或为了这样的行动提供重要的支持或资源（如在标题 18 第 2339A 节内所规定的)而引起的人身伤害或死亡而向外国索取的金钱赔偿，而如果这样的行动或提供重要的支持是由该外国的主管、雇员或代理人在他或她的职责范围内、雇佣期间、或代理期间参与的，除了法院应根据本段内容拒绝受理权利要求者以外：

  •(A) 如果在该行动发生时对外国未根据 1979 年出口管理法第 6(j) 节 (50 U.S.C. 附录 2405(j)) 或 1961 年对外援助法第 620A 节 (22 U.S.C. 2371) 被指明为恐怖主义的赞助国，除非后来作为该行动的后果被这样指明者；以及

  •(B) 即使该外国被或曾被这样指明者，如果：

- •(i) 对于发生在外国的行为已提出权利要求以及提出要求者尚未给予外国合理的机会根据已接受的国际仲裁规则对权利要求进行仲裁者；或
- •(ii) 当作为权利要求所依据的行动发生时，提出要求者或受害人并不是美国的侨民（就如移民和国籍法第 101(a)(22) 节内所规定的）者。
- •(b) 外国不应免受美国法院对于任何对外国的船只或货物强制执行海事留置权而提出的海事诉讼案件的法律管辖权，其海事留置权是以外国的商业活动为基础的：其条件是：
  - •(1) 诉讼通知是通过递送传票和诉状的副本给予拥有被确定要执行海事留置权的船只或货物的这个人或其代理人的；而且如果该船只或货物依据代表提起诉讼的当事人所得到的司法程序所扣留时，扣留程序的送达应被认为构成了该通知的有效递送，但是提起诉讼的当事人应对于外国因这样扣留的后果而遭受的任何损害负有责任，如果提起诉讼的当事人已经真实或推定知晓这样的做法涉及到外国的船只或货物的话；以及
  - •(2) 本标题第 1608 节内所规定的对外国诉讼开始的通知可以在本小节第 (1) 段内所规定的通知递送的十天之内开始，也可以在当事人不知道涉及到外国的船只或货物的情况下，在该当事人终止外国利益存在的日期开始。
- •(c) 不论该通知按照小节 (b)(1) 何时得到递送，要强制执行海事置留权的诉讼此后应根据法律原则和对物诉讼的习惯规则进行并应听证和裁定而不管何时船只似乎已经被私人拥有和占有，并已经维持对物诉讼。对外国的判决可能包括诉讼费用，以及如果判决是为了财产判决的话，还应包括由法院决定的利息，除非该法院可能不以大于由此引起海事留置权的船只或货物价值的金额对外国进行判决。该项价值应根据小节 (b)(1) 送达通知的时间来决定。判决应服从于上诉和在其他海事法和海上法律管辖权案件内所提供的修订本。任何情况都不应阻止原告在如本节内所规定的为了强制执行海事留置权而提出的相同诉讼内的任何适当的案件内要求对人的救济。
- •(d) 如 1920 年船舶抵押法 (46 U.S.C. 911 和以下内容) 内所规定的，外国不应免受美国法院在任何为了结优先抵押而提出任何诉讼的法律管辖权。该诉讼应根据该法令的规定并根据法律的原则和对物诉讼的习惯规则提出、听证和裁定而不管何时船只似乎已经被私人拥有和占有，并已经维持对物诉讼。
- •(e) 为了小节 (a) 第 (7) 段之目的：
  - •(1) 术语"虐待"和"与司法无关的杀害"具有 1991 年虐待受害人保护法第 3 节内术语所给出的意义；

- •(2) 术语"扣押人质" 具有反对扣押人质国际公约第 1 款内术语所给出的意义；以及
- •(3) 术语"航空器破坏活动" 具有抑制针对民航安全非法行为约定的第 1 款内术语所给出的意义。
- •(f) 不应根据小节 (a)(7) 维持诉讼，除非该诉讼开始于诉讼原因发生之日起不迟于 10 年之内。所有公平征税的原则，包括外国免于诉讼的期间均应适用于本限制时期的计算。
- •(g) 对要求告知的限制:
  - •(1) 一般情况:
    - • (A) 以第 (2) 段为准，如果提出的某项诉讼可能在其他方面被第 1604 节所禁止，但适合于小节 (a)(7) 时，法院应根据司法部长的请求暂停被司法部长证实要求告知可能会对和引起诉讼原因的事件有关的犯罪调查或起诉，或国家安全工作产生重大干扰的任何有关美国的要求告知的请求、要求或命令，直至司法部长通知法院这样的请求、要求或命令将不会再产生这种干扰的时候为止。
    - • (B) 本段所述的暂停应当在开始于法院签发命令暂停要求告知之日起的 12 个月期间内保持有效。如果司法部长证实要求告知可能会对和引起诉讼原因的事件有关的犯罪调查或起诉，或国家安全工作产生重大干扰，法院应根据美国的提议把这个暂停要求告知的命令再延长 12 个月期限。
  - •(2) 届满条款:
    - • (A) 以第 (B) 小段为准，暂停不应被准许或继续按照第 (1) 段的内容在引起诉讼原因的事件发生之日起 10 年以后的日期还保持有效。
    - • (B) 在第 (A) 小段内提及的期限以后，法院根据司法部长的要求可以暂停任何 有关美国的要求告知的请求、要求或命令，凡是它们被法院发现有重大可能性会:
      - •(i) 对任何人产生严重的死亡威胁或严重的身体伤害时;
      - •(ii) 不利地影响美国在和外国和国际法强制执行机构在调查违反美国法方面的合作工作能力时; 或
      - •(iii) 妨碍和引起诉讼原因的事件有关的犯罪案件或暗中破坏该案件定罪的可能时。
  - •(3) 证据的评估: 法院对于根据本小节由司法部长提出的任何暂停要求的评估应该单方面和禁止旁听地进行。
  - •(4) 禁止拒绝受理的提议: 根据本小节的内容对要求告知的暂停应构成禁止依据民事程序联邦规则 12(b)(6) 和 56 条的规定准许拒绝受理的提议。
  - •(5) 释义: 本小节内的任何内容都不应阻止美国请求保护性命令或维护对于美国一般有效的特权。

**第 1606 节. 责任的范围**

对于根据本章第 1605 或 1607 节的内容和外国无权享受豁免权有关的任何救济要求，外国应该以相同的方式和相同的范围作为在同样情况下的单独个人负有责任；但外国除了对其代理人或机构以外不应对惩罚性赔偿负责，除非是根据第 1605(a)(7) 或 1610(f) 节而提出的任何诉讼；不过，如果对于造成死亡的任何案件，在该行为或不作为发生地的法律规定，或已经被解释为规定对于赔偿只是在性质上是惩罚性的话，则外国应该对实际的或补偿性的赔偿负责。这样的赔偿是以为了其利益而提出诉讼的人士所蒙受的由于该死亡而导致的金钱损失为基准的。

**第 1607 节. 反诉**

在任何由外国提出的，或其中有外国干预的诉讼内，外国不应在美国或州法院内被给予与任何反诉相关的豁免权

•(a) 为此外国无权根据本章第 1605 节享有豁免权而使该起诉在对外国的分离的诉讼内提出；或

•(b) 由作为外国的起诉主题的事务或事件所引起的；或  (c) 就反诉而言并不要求超过金额的救济或在方式上和外国所要求的不同。

**第 1608 节. 送达、答复的时间、缺席判决**

•(a) 美国和州法院的送达应对外国或外国的政治属地进行:
    •(1) 根据原告和外国或政治属地之间的任何特别安排递送传票和诉状的副本；或
    •(2) 如果不存在特别安排，就根据关于司法文件送达的适用的国际公约递送传票和诉状的副本；或
    •(3) 如果不能根据第 (1) 或 (2) 段用寄送传票和诉状副本与诉讼通知，并附有各自相应的外国官方语言的译文文本进行送达的话，则可以由法院的书记员通过需要签收回执的任何形式的邮件，以外国外交部有关主管的姓名地址进行寄送，或
    •(4) 如果不能根据第 (3) 段在 30 天之内进行送达的话，可以由法院书记员通过需要签收回执的任何形式的邮件以华盛顿哥伦比亚特区的国务卿的姓名地址寄送两份传票和诉状副本与诉讼通知，并附有各自相应的外国官方语言的译文文本给特别领事服务的主管 −

而秘书则应通过外交渠道向外国发送一份文件的副本并应向法院书记员寄送一份表明文件已经被发送的外交记录的证明副本。犹如在本小节内所使用的，"诉讼通知"应该是指投寄给外国的以国务卿根据规定指定格式的一份通知。

- (b) 美国和州法院的送达应对外国的代理人或机构进行：
    - (1) 根据原告和代理人或机构之间的任何特别安排递送传票和诉状的副本；或
    - (2) 如果不存在特别安排，可以向官员、经理或一般代理人、或在美国经任命或经法律授权可以接受诉讼程序送达的任何其他代理人；或根据关于司法文件送达的适用的国际公约递送传票和诉状的副本；或
    - (3) 如果不能根据第 (1) 或 (2) 段进行送达，而且如果合理地打算给予实际通知的话，可以按以下方法寄送传票和诉状副本与诉讼通知，并附有各自相应的外国官方语言的译文文本：
        - (A) 按外国当局或政治属地的指示或为了响应调查委托书或要求或
        - (B) 通过需要签收回执的任何形式的邮件，由法院书记员以要送达的代理人或机构的姓名地址进行送达，或
        - (C) 按和送达实施地的法律相一致的法院命令的指示。

- (c) 送达应被认为已经完成的情况：
    - (1) 在根据小节 (a)(4) 进行送达的情况下，就是外交记录证明副本所表明的传送日期；和
    - (2) 在根据本节进行送达的任何其他情况下，就是送达证明、签收并退回的邮政收据、或适用于所使用的送达方法的其他送达证明上表明的收到日期。

- (d) 在美国或州法院所提出的任何诉讼内，外国、其政治属地或外国的代理人或机构应当在根据本节完成送达之后的六十天之内送达一份对诉状的答复或其他答辩状。

- (e) 美国或州法院不应对外国、其政治属地或外国的代理人或机构实行缺席判决，除非提出要求者以令法院信服的证据来证实其起诉或救济权力。这种缺席判决的任何副本应该以本节所说明的方式寄送给外国或政治属地。

**第 1609 节.** 外国财产查封和执行的豁免权

以本法令颁布之时美国是其中参与方的现有国际协议为准，除了在本章第 1610 和 1611 节内所规定的以外，在美国的外国财产应免于查封拘留和执行。

**第 1610 节.** 外国财产查封和执行豁免权的例外

•(a) 犹如在本章第 1603(a) 节内所规定的，在美国并用于在美国的商业活动的外国财产，不应免于用来协助执行的查封或免于执行，根据由美国或州法院在本法令的生效日期以后作出的判决，如果

>•(1) 外国已经明示或暗示地放弃其免受用来协助执行的查封或免于执行的豁免权，尽管外国除了根据弃权条款以外可能打算实施弃权的任何撤回，或
>•(2) 该财产现在或曾经用于权利要求以此为基础的商业活动的，或
>•(3) 执行和确定财产权的判决有关，而该财产权的行使已经违反了国际法或已用于交换财产的财产权的行使违反了国际法，或
>•(4) 执行和确定财产权的判决有关：
>>•(A) 该财产是通过继承或赠与获得的，或
>>•(B) 该财产是不能移动并位于美国的：倘若该财产并非是用于维持外交或领事使团之目的者或者是该使团长官的住所的，或
>•(5) 该财产包含任何契约性的责任或任何收益的，其中凭汽车或其他责任保险单或涵盖了合并于该判决内的索赔的意外事故保险的契约性债务以赔偿或保持外国或其雇员免受损失的，或
>•(6) 该判决是基于一项确认对外国作出的仲裁裁决的，倘若为了协助执行而查封、或执行可能与仲裁协议内的任何规定不相一致的，或
>•(7) 该判决和一项根据第 1605(a)(7) 节的内容外国不能豁免的权利要求有关，而不管该财产现在或曾经是否涉及到以此为基础而提出权利要求的行为。

•(b) 除了小节 (a) 所述以外，外国代理人或机构在美国参与商业活动的并在美国的任何财产都不应免受根据美国或州法院在本法令生效日期以后作出判决为协助执行而进行的查封或执行，如果

>•(1) 该代理人或机构已经明示或暗示地放弃其免受用来协助执行的查封或免于执行的豁免权，尽管该代理人或机构除了根据弃权条款以外可能打算实施弃权的任何撤回，或
>•(2) 该判决和一项权利要求有关，其中该代理人或机构由于第 1605(a)(2)(3)、(5) 或 (7) 节或本章的第 1605(b) 节的规定不能豁免，而不管该财产现在或曾经是否涉及到以此为基础而提出索赔的行为。

•(c) 直至法院确定作出判决和发出本章第 1608(e) 节内所要求的任何通知以后已经过去了一段合理的时间而下令进行该查封和执行以后，在本节的小节 (a) 和 (b) 内提及的查封或执行才应获得许可。

•(d) 如在本章第 1603(a) 节内所规定的，在美国用于商业活动的外国财产在美国或州法院对提出的任何诉讼作出判决之前，或在本节的小节 (c) 内所规定的时期过去之前不应免于查封，如果

　　•(1) 外国已经明确放弃其在判决之前免于查封的豁免权，尽管外国除了根据弃权条款以外可能打算实施弃权的任何撤回，和

　　•(2) 查封的目的是为了保证已经或最终可能对外国作出的判决的执行，而并不是为了获得法律管辖权。

•(e) 外国的船只不应免受如在第 1605(d) 节内所规定的为了取消优先抵押而提起的诉讼内的对物扣留、临时出售和执行。

•(f)　　•(1)　　•(A) 尽管有法律的任何其他规定，包括但并不限于外国使团法 (22 U.S.C. 4308(f)) 的第 208(f) 节，以及除了在 (B) 分段内所规定的内容，任何被依据与敌国贸易法(50 U.S.C. 附录 5(b)) 的第 5(b) 节、1961 年对外援助法 (22 U.S.C. 2370(a)) 的第 620(a) 节、国际紧急经济力量法 (50 U.S.C. 1701-1702) 的第 202 和 203 节或据此发布的任何其他公告、命令、规则或许可所禁止或控制的财务事项有关的财产，均应服从于任何与权利要求有关的判决的执行或为了协助执行的查封，该权利要求是某个外国（包含任何代理人或机构或这类国家）要求该财产不应根据第 1605(a)(7) 节得到豁免而提出的。

　　　　•(B) 分段 (A) 是不适用的，如果财产在被外国征用或没收的时候，该财产已经被某个自然人以产权形式持有，或者如果是以信托形式的话则已经被某个或几个自然人为了利益而持有。

　　•(2)　　•(A) 应任何已经对其作出了与权利要求有关的有利判决的当事人的要求，该权利要求是为了某个外国不应根据第 1605(a)(7) 节得到豁免而提出的，财政部长和国务卿应完全、迅速和有效地协助任何判定债权人或已经签发任何此类对外国或该国任何代理人或机构的财产进行确定、查找和执行的判决的任何法院。

　　　　•(B) 为了提供此类帮助，财政部长和国务卿应：(i) 可以盖上公章书向法院提供此类信息以及 (ii) 应该用足以允许法院指示美国联邦法院执行官办公室迅速而有效地对该财产执行判决的方式向其提供信息。

## 第 1611 节. 免于执行的某些财产的类别

•(a) 尽管有本章第 1610 节的规定，由总统指明有权享受由国际组织豁免权法规定的特权、免责和豁免权的这些组织的财产不应服从于作为在美国或州法院提出诉讼结果的查封或任何其他阻碍向外国支付资金的，或类似的司法程序。

•(b) 尽管有本章第 1610 节的规定，外国的财产应免于查封并免于执行，如果：(1) 该财产系一家外国中央银行或金融当局为其自己的账户保留的，除非该银行或主管当局，或其上级的外国政府，已经明确放弃其免受于协助执行而进行查封、或免于执行的豁免权，尽管银行、金融当局或政府除了根据弃权条款以外可能打算实施弃权的任何撤回；或  (2) 该财产是，或计划是和用于军事活动有关的和 (A) 属于军事性质的，或 (B) 由军事当局或防卫机构所控制的。尽管银行、金融当局或政府除了根据弃权条款以外可能打算实施弃权的任何撤回

•(c) 尽管有本章第 1610 节的规定，外国财产应免受根据 1996 年古巴自由和民主团结 (LIBERTAD) 法第 302 节所提出诉讼内的查封并免于执行只要该财产是属于由委派的外交使团用于官方目的的设施或设备的范围之内。

-------------------

### 1976 年修订出版物第 94-583 行的简略标题

1976 年 10 月 21 日 90 法规 2891 **第 1 节**规定："本法令(制定本标题第 1330 和 1602 至 1611 节、修改中的第 1332、1391 节和本标题的第 1441 节，并制定本标题第 1602 节内作为注解提出的规定) 可以作为'1976 年外国最高主权豁免权法' 而被引用。"**来源** 增添出版物第 94-583 行，1976 年 10 月 21 日 90 法规 2892 第 4(a) 节。

### 可分离性

出版物第 4-583 行的**第 7 节**规定："如果本法令 (制定本章和本标题第 1330 节、修改本标题的第 1332、1391 和 1441 节，并制定在本节和本标题第 1 节内作为注解提出的规定) 的任何规定或其对任何外国的运用无效的话，该无效性并不影响其他规定或本法令的运用。因为本法令可以没有无效的规定或运用而依然有效，也就是说本法令的各项规定是可分开的。"

### 生效日期

出版物第 94-583 行的**第 8 节**规定："本法令(制定本章和本标题第 1330 节、修改本标题的第 1332、1391 和 1441 节，并制定在本节和本标题第 1 节内作为注解提出的规定) 应在其颁布之日的九十天以后生效 (1976 年 10 月 21 日)。"

### 简略标题

对于出版物第 94-583 行作为"1976 年外国最高主权豁免权法"的简略标题，请阅本标题第 1 节下作为 1976 年修订注解简略标题发表的出版物第 94-583 行的第 1 节。



CERTIFIED MAIL

7022 3330 0300 9798 4667

US POSTAGE
$ 015.00°

FROM

U.S. DEPARTMENT OF STATE,
L/CA/POG
SA-17, 10TH FLOOR
WASHINGTON, DC 20522-1710

TO

Ms. Karen Mitchell
United States District Court
Northern District of Texas
1100 Commerce St.
Dallas, TX 75242

{ZIP + 4}